**UNITED STATES of America,
Appellee,**

v.

**Donald R. WHITE, Defendant–
Appellant.**

**Docket No. 98–1102.**

United States Court of Appeals,
Second Circuit.

Argued March 19, 1999.

Decided April 23, 1999.

JOSÉ A. CABRANES, Circuit Judge:

Donald R. White appeals from a February 9, 1998 judgment of the United States District Court for the Western District of New York (Richard J. Arcara, *Judge*) convicting him, after a jury trial, of one count of bank fraud, in violation of 18 U.S.C. §§ 1344[1] and 2,[2] and one count of passing an altered United States Postal Service money order, in violation of 18 U.S.C. §§ 500[3] and 2. The district court sentenced White primarily to imprisonment for 30 months and to three years of supervised release, and imposed restitution in the amount of approximately $25,418. White's principal claim on appeal is that, because of an asserted conflict of interest with his attorney, he received ineffective assistance of counsel at sentencing.[4] We conclude that there was no such conflict of interest and, accordingly, affirm.

Edward S. Zas, The Legal Aid Society, New York, NY, for Appellant.

Joseph J. Karaszewski, Assistant United States Attorney, Western District of New York (Denise E. O'Donnell, United States Attorney, Arlene Hibschweiller, Special Assistant United States Attorney, of counsel) for Appellee.

Before: CABRANES and STRAUB, Circuit Judges, and TSOUCALAS,* Judge, Ct. of Int'l Trade.

## I.

Based on the evidence presented at trial and at a sentencing hearing, the district court made the following findings of fact. Sometime in the spring of 1996 White came into the possession of approximately eight blank, stolen postal money orders. With the help of Cheryl Ruttlen, his then-girlfriend, White devised and implemented a scheme to commit fraud by altering the money orders and cashing them through the use of third parties' bank accounts; in return for their assistance, White would pay the third parties a portion of the proceeds from the forged money orders.

* The Honorable Nicholas Tsoucalas, of the United States Court of International Trade, sitting by designation.

1. 18 U.S.C. § 1344 provides, in pertinent part, that "[w]hoever knowingly executes, or attempts to execute, a scheme or artifice (1) to defraud a financial institution; or (2) to obtain any of the moneys ... of [ ] a financial institution, by means of false or fraudulent pretenses ... shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both."

2. 18 U.S.C. § 2 provides, in pertinent part, that "[w]hoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal."

3. 18 U.S.C. § 500 provides, in pertinent part, that "[w]hoever, with intent to defraud, passes ... any ... forged or altered money order or postal note, knowing ... any material alteration therein to have been falsely made ... [s]hall be fined under this title or imprisoned not more than five years, or both."

4. White also asserts that the district court's jury instruction on bank fraud contained reversible error. We have considered this claim and find it to be without merit.

In October 1996 White was charged in a seven-count indictment with three counts of bank fraud, in violation of 18 U.S.C. §§ 1344 and 2, and four counts of passing and attempting to pass a forged postal money order, in violation of 18 U.S.C. §§ 500 and 2. The indictment initially charged White with crimes relating to three forged money orders. However, in June 1997 the district court granted a motion by the government to dismiss five of the seven counts and to redact the indictment to charge only one count of bank fraud and one count of passing a forged money order, both of which concerned a single money order. As indicated above, a jury ultimately returned guilty verdicts as to both counts of the redacted indictment. Throughout the proceedings below—both at trial and at sentencing—White was represented by appointed counsel Kimberly A. Schechter, of the Federal Public Defender's Office for the Western District of New York. White is represented by new counsel in this appeal.

The Presentence Investigation Report ("PSR") prepared by the United States Probation Office in anticipation of White's sentencing indicated that White qualified for a Sentencing Guidelines range of imprisonment of 27 to 33 months, reflecting sentencing enhancements based on: a loss amount of $29,049 (a figure that incorporated both the $9,631 money order related to the offenses of conviction and two additional money orders underlying the dismissed counts), see U.S.S.G. § 2F1.1; the fact that the offense involved more than minimal planning, see id. § 2F1.1(b)(2)(A); White's role as an organizer or leader of a criminal activity, see id. § 3B1.1(c); and White's obstruction of justice, see id. § 3C1.1.

On White's behalf, Schechter filed written objections to each of these adjustments and to the government's request for an upward departure; she also asked the district court to grant White a downward adjustment for having played a minimal role in the offense. Because White's ineffective assistance claim is based exclusively on the sentencing proceedings that ensued, we describe them in some detail below.

On December 2, 1997 the district court held a hearing to resolve the disputed sentencing issues. Shortly after the commencement of the hearing, White interrupted Schechter's preliminary remarks and requested substitute counsel. White prefaced his comments by saying that "Kim is okay, she's a good attorney and all that ... I don't mean no disrespect." But then, apparently in an agitated state, he went on to assert that he was innocent of the offenses of conviction and that he disagreed with Schechter's decision not to call Cheryl Van as a witness at the sentencing hearing, claiming that Van would have supported his claim of innocence.[5] White also told the district court that he faulted Schechter for failing to file motions for a judgment of acquittal, pursuant to Fed. R.Crim.P. 29, and for a new trial based on newly discovered evidence, pursuant to Fed.R.Crim.P. 33.

At the conclusion of White's comments, Schechter asked for, and was granted, an opportunity to respond. She began by explaining that she had interviewed Cheryl Van but had concluded that Van's version of events was inconsistent with White's and that, in any event, Van's testimony would not have been helpful to the case. In addition, Schechter stated that, after discussing the matter with White, she had concluded that there was no new evidence to justify a Rule 33 motion for a new trial. Schechter further explained to the district court that she believed that White's comments simply reflected his frustration over the perceived unfairness of the government's request for an enhanced sentence based on conduct underlying the dismissed counts. And, in response to the district court's observation that a change in coun-

5. Van apparently was the neighbor of the third-party accomplice involved in cashing the money order underlying White's offenses of conviction.

sel would not benefit or satisfy White, Schechter stated, "I'm prepared to proceed. I'm prepared to keep representing [White]. I know he's frustrated." The district court then denied White's request for substitute counsel and continued with the hearing, which took place over a four-day period between December 2 and 5, 1997. The hearing included the live testimony of, among others, White's accomplice, Cheryl Ruttlen.

On January 15, 1998, the district court issued a Memorandum Decision and Order in which it ruled that it would apply all of the upward adjustments calculated in the PSR. In addition, the court declined both White's request for a downward adjustment and the government's request for an upward departure. Based on its rulings, the district court announced its intention to sentence White within a Guidelines range of imprisonment of 27 to 33 months. In explaining its conclusions, the district court specifically credited Cheryl Ruttlen's testimony that she had become involved in the fraudulent scheme at White's invitation and that, on numerous occasions since his arrest and conviction, White had encouraged Ruttlen to lie to the postal inspectors and to the district court regarding his role in the offense. The district court also concluded that certain tape-recorded conversations that White had offered at the sentencing hearing to undermine Ruttlen's credibility were merely "an effort by [White] to manufacture exculpatory evidence and [were] completely unreliable for the purpose for which they were admitted."

White subsequently appeared before the district court for sentencing on February 5, 1998. Just after the commencement of the proceedings, Schechter informed the district court that, against her advice, White wanted to ask for an adjournment. In his ensuing remarks, White essentially claimed that he wanted a postponement of sentencing so that he could obtain evidence that would prove that Cheryl Ruttlen had directed the postal money order scheme at

issue in his case. He also asserted that Schechter had been "ineffective at trial" because she had not objected, on relevance grounds, to the admission of the forged postal money order underlying his conviction. White further criticized Schechter for failing to subpoena bank records that, White claimed, would have demonstrated that he was not the organizer of the postal money order scheme. Finally, White vaguely alluded to a disagreement with Schechter over whether certain evidence that Schechter had not presented at trial would have "implicated" him as "a conspirator or something like that." White became so agitated during the course of his remarks that the district court observed, "I understand you're very upset about this case. You're probably about as upset as any defendant I've seen in a long time."

At the conclusion of White's comments, the district court addressed Schechter and asked, "[D]o you want to say anything?" Schechter confirmed White's assertion that he had discussed with her the possibility of introducing evidence of other criminal activity by Cheryl Ruttlen. Schechter confirmed also that she did not pursue the issue at trial because, after investigation, she concluded that doing so "would probably provoke and bring forth even more criminal activity" on White's part. She emphasized the point by adding that, "I still stand by that ... I know I would not get involved in that area of cross-examination, for the reason that I think it would prompt more incriminating evidence against Mr. White." Addressing the issue of why she had decided not to call certain witnesses at trial, Schechter explained that one of the witnesses, Cheryl Van, had told her "something that was incriminating about [White's] case." Schechter further explained that the other witness suggested by White was Cheryl Ruttlen and that, in light of the damaging testimony that Ruttlen gave at the sentencing hearing, the reason not to call her at trial was self-evident. In response to these comments, the district court stated, "I don't mean to

put you into true confessions here, Ms. Schechter ... if anything, you are one of the more aggressive, thorough, complete, professional defense counsels [who] try cases here."

Having heard from Schechter and White, the district court denied White's request for an adjournment and proceeded to explain its Sentencing Guidelines calculations, mostly by adverting to the rulings set forth in its order of January 15, 1998. Before actually imposing sentence, the district court invited Schechter to speak on White's behalf. In response, Schechter stated, "I think actually that the record is complete the way it is. I made extensive arguments at the end of the sentencing hearing, I filed a number of documents where I've put forth my arguments, and I know that the Court has listened to and carefully reviewed all the documents, and I have nothing to add." The district court then gave White an opportunity to speak. White responded by attempting a point-by-point rebuttal of the evidence adduced at trial and at the sentencing hearing and by again asking for an adjournment so that he could prove that the postal money order scheme was Ruttlen's, not his. In total, the district court permitted White to speak virtually uninterrupted for what amounted to approximately twenty transcript pages.

After listening to White's critique of its rulings on the disputed sentencing issues, the district court offered White a final opportunity to "tell [the court] some reason why [it] should sentence [him] somewhere other than the maximum here." The court further asked, "What are the good qualities [of] Donald White?" White responded that he had suffered from a life-long drinking problem, but that he desired rehabilitative treatment. He also stated that, before his recent re-imprisonment for a supervised release violation,[6] he had en-rolled in a vocational training program.

At the conclusion of these remarks, the district court asked Schechter if she had anything to add. Schechter responded that she did not. The government then argued to the district court that White's repeated obstruction of justice called for a sentence at the high end of the Guidelines range. Schechter objected to the government's argument, on the ground that the district court's Guidelines calculations already included an upward adjustment for obstruction of justice.

Finally, the district court announced that it would impose a sentence of imprisonment for 30 months, to run consecutively to the sentence imposed on January 29, 1997 for White's violation of supervised release. The court indicated that it had been its intent to impose the maximum sentence within the Guidelines range, but that, because White "finally admitted the fact that maybe [he's] got [a] problem," the court would sentence him in the middle of the Guidelines range.

## II.

Under the familiar standard articulated in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), a defendant who seeks to establish a claim of ineffective assistance of counsel must affirmatively demonstrate both that counsel's performance fell below an objective standard of reasonableness and that he suffered prejudice, in the sense that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. 2052; *see also Brown v. United States*, 167 F.3d 109, 109–10 (2d Cir.1999). However, a somewhat different standard, articulated by the Supreme Court in *Cuyler v. Sullivan*, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333

6. At the time that he committed the acts leading to his conviction in this case, White was serving a term of supervised release stemming from a 1993 conviction for making false statements on a loan application. On January 29, 1997, on the basis of a supervised release violation unrelated to this case, Judge Arcara sentenced White to a separate twenty-four-month term of imprisonment.

(1980), governs an ineffective assistance claim based on an asserted conflict of interest. In this context, a defendant is entitled to a presumption of prejudice if he can demonstrate that his attorney labored under an actual conflict of interest and that the "actual conflict of interest adversely affected his lawyer's performance." *Id.* at 348–49, 100 S.Ct. 1708; *see also Strickland,* 466 U.S. at 692, 104 S.Ct. 2052; *United States v. Stantini,* 85 F.3d 9, 15–16 (2d Cir.), *cert. denied,* 519 U.S. 1000, 117 S.Ct. 498, 136 L.Ed.2d 390 (1996).[7] We have held that this presumption of prejudice is rebuttable. *See United States v. Luciano,* 158 F.3d 655, 661 (2d Cir.1998). And, while conflict of interest claims arise most frequently in the context of multiple or joint representation, it is well settled that the *Cuyler* analysis applies in situations where, as here, the asserted conflict is between the interests of the defendant and those of his attorney. *See United States v. Fulton,* 5 F.3d 605, 609 (2d Cir. 1993).

White argues that his requests for substitute counsel and his concomitant complaints regarding Schechter's performance created an actual conflict of interest. According to White, Schechter was faced with a choice between defending herself against his allegations or, by supporting his requests for substitute counsel and for an adjournment, subjecting herself to liability for malpractice. Moreover, White maintains that this asserted conflict of interest adversely affected Schechter's performance. Specifically, he argues that, as a result of the conflict, Schechter "contradicted [him] in open court," told "the court

that more incriminating information about [him] existed," twice declined opportunities at the February 5, 1998 hearing to argue for leniency, and failed to ask the court to impose a sentence of imprisonment concurrent with the one that he was already serving for having violated his supervised release.[8]

In support of his claim that Schechter labored under an actual conflict of interest, White relies principally on our decision in *Lopez v. Scully,* 58 F.3d 38 (2d Cir.1995). The defendant in *Lopez* had pled guilty to murder charges but, prior to sentencing, submitted a *pro se* motion to withdraw his guilty plea. In his motion, Lopez contended that the plea had been induced through the threats and coercion of his attorney and that the attorney's pre-trial preparation had been inadequate. *See id.* at 40. When Lopez appeared for sentencing, his attorney told the court that, " '[f]or the record,' " he denied " 'each and every allegation contained' " in the motion. *Id.* Then, without further discussion of the issue, the court denied Lopez's motion and continued with the sentencing proceeding. In assessing Lopez's subsequent petition for a writ of habeas corpus, we concluded that, at the point that Lopez alleged that his attorney had coerced him into pleading guilty, "the attorney had an actual conflict of interest: to argue in favor of his client's motion would require admitting serious ethical violations and possibly subject him to liability for malpractice; on the other hand, '[a]ny contention by counsel that defendant's allegations were not true would ... contradict his client.' " *Id.* at 41 (quoting *United States v. Ellison,* 798 F.2d

---

**7.** We have held the following to be *per se* violations of the Sixth Amendment, requiring no further showing in order for the defendant to obtain relief: "(1) where the attorney was not licensed to practice law because he failed to satisfy the substantive requirements of admission to the bar, and (2) where the attorney was implicated in the defendant's crime." *United States v. O'Neil,* 118 F.3d 65, 71 (2d Cir.1997), *cert. denied,* — U.S. ——, 118 S.Ct. 728, 139 L.Ed.2d 666 (1998). No such claims are at issue here.

**8.** In one of her written, sentencing-related submissions to the district court, Schechter states that "[t]he defendant will be requesting a concurrent sentence under Section 5G1.3(c) of the U.S. Sentencing Guidelines." However, Schechter did not raise the issue again during the subsequent proceedings in open court.

1102, 1107 (7th Cir.1986)). White maintains that his requests for substitute counsel and for an adjournment, coupled with his criticism of Schechter's performance, created a similar conflict of interest during the sentencing proceedings below. We disagree.

Perhaps in an effort to obtain the benefit of *Cuyler*'s presumption of prejudice—and thereby avoid the *Strickland* requirement that prejudice be affirmatively proven—White has essentially characterized a routine disagreement with his appointed counsel over defense strategy as a conflict of interest. However artful, White's claim is ultimately unpersuasive.

■ It would be an understatement to observe that disputes like the one between White and Schechter arise frequently, and such disagreements often culminate in a defendant's request for substitute counsel. (White's appellate counsel readily conceded at oral argument before us that scenarios like the one involved here—where, at sentencing, a disgruntled defendant in open court criticizes his attorney's performance—"happen[ ] all the time.") And, when presented with substantial complaints regarding counsel's performance, a trial court is generally under an obligation to inquire into the reasons for the defendant's dissatisfaction. *See McKee v. Harris,* 649 F.2d 927, 933 (2d Cir.1981). Accordingly, it is to be expected that counsel will often be placed in the difficult position of having to comment on an asserted disagreement with her client, if only to inform the court as to whether she believes that she can continue the representation. Under these circumstances, we decline to adopt any broad rule that would suggest that, simply by expressing dissatisfaction with his attorney's performance, a defendant can create a "conflict of interest" that can be said to require the attorney to choose between advancing the attorney's own cause and that of her client.

This conclusion is fully in accord with our decision in *Lopez.* Crucial to our finding of a conflict of interest in that case was the defendant's allegation that his attorney had coerced him into pleading guilty. Such a claim is extremely serious and, we would hope, unusual. By contrast, in this case, White merely expressed disagreement with his attorney over whether to file certain motions, to pursue certain evidentiary leads, to object to the introduction of certain evidence at trial, and to call certain witnesses at trial and at a sentencing hearing. A defendant's decision to raise complaints of this nature before the trial court does not give rise to a conflict of interest between the defendant and his attorney.[9]

■ Of course, our holding does not insulate an attorney from an ineffective assistance claim based on actions taken by the attorney in response to criticism of the sort that White directed at Schechter in this case. Even in the face of allegations like White's, defense counsel owes a paramount duty of loyalty to her client. Nonetheless, we conclude that a claim of the sort that White raises in this appeal must be measured under the *Strickland* standard, which, as explained above, requires an affirmative showing of both objectively unreasonable performance and prejudice. *Cf. United States v. O'Neil,* 118 F.3d 65, 72 (2d Cir.1997) (holding that fee dispute did not create conflict of interest but that "[t]o the extent that [an] attorney shirks his ethical obligation to dutifully represent his client as a result of a fee dispute, we believe *Strickland* provides the appropriate analytic framework"). In this case, White based his ineffectiveness claim on the existence of an actual conflict of interest and did not urge that the asserted deficiencies in his attorney's performance

---

9. We have held in other contexts that disputes between defendants and their attorneys do not necessarily constitute conflicts of interest. *See, e.g., United States v. O'Neil,* 118 F.3d 65, 71–72 (2d Cir.1997) (no conflict of interest arising from defendant's failure to pay fees, from attorney's motion to withdraw, or from attorney's civil suit against client for failure to pay fees).

rose to the level of ineffective assistance under *Strickland.* Accordingly, we affirm the judgment of the district court without intimating any view on that issue.

### III.

For the foregoing reasons, the judgment of the district court is affirmed.