**UNITED STATES of America,
Appellee,**

**v.**

**Scott Ian MOREE, also known as Paul
T. Salmon, Defendant–Appellant.**

**Docket No. 99–1301**

United States Court of Appeals,
Second Circuit.

Argued: Jan. 21, 2000
Decided: July 17, 2000

Steven M. Statsinger, The Legal Aid Society, Federal Defender Division Appeals Bureau, New York, NY., for Appellant.

Alex V. Hernandez, Assistant United States Attorney (Stephen C. Robinson, United States Attorney, on the brief), Bridgeport, Conn. for Appellee.

Before: CARDAMONE, LEVAL and PARKER, Circuit Judges.

LEVAL, Circuit Judge:

Defendant Scott Moree appeals from a sentence imposed pursuant to a judgment of conviction entered April 14, 1999 in the United States Court for the District of Connecticut (Alan H. Nevas, *Judge*), on his plea of guilty to counts of conspiracy to possess cocaine base with intent to distribute cocaine base, in violation of 21 U.S.C. §§ 841(a)(1) and 846, and illegal reentry into the United States after deportation, in violation of 8 U.S.C. § 1326(a). On appeal, Moree contends that he was denied his Sixth Amendment right to effective assistance of counsel at his sentencing hearing because his appointed attorney was laboring under an actual conflict of interest resulting from the fact that Moree had accused him of coercing Moree's plea and of ineffective representation. Moree, however, is not seeking to vacate the plea. He seeks only to be re-sentenced while represented by new counsel.

We affirm the judgment.

## BACKGROUND

### A. The criminal conduct charged

Defendant Scott Moree, an alien and citizen of Jamaica, was deported from the United States on May 12, 1995. Sometime thereafter he reentered the United States

without permission of the Attorney General.

After his illegal reentry, Moree became involved with a gang that sold drugs in Bridgeport, Connecticut. Wiretapped telephone conversations captured Moree participating in the conspiracy by agreeing to sell drugs to customers. On March 16, 1998, Moree was arrested after he sold a small quantity of cocaine to an undercover United States Marshall. By indictment, Moree was charged with conspiracy to possess cocaine base with intent to distribute, as well as with distribution and possession with intent to distribute, in violation of 21 U.S.C. §§ 846 and 841(a)(1). By separate indictment, Moree was charged with two counts of illegal reentry, in violation of 8 U.S.C. § 1326(a).

### B. Moree's relationship with counsel prior to his plea

On March 17, 1998, counsel was appointed to represent Moree. On December 1, 1998, following several months of pre-trial proceedings, the district court ordered jury selection to commence on February 1, 1999, trial to begin immediately thereafter. On December 5, 1998, Moree wrote to Judge Nevas complaining that his counsel had failed to move for a speedy trial, which he characterized as "highly prejudicial;" Moree requested a "hearing to determine my attorney's competency." On the same date, Moree wrote to counsel, returning unsigned a form of waiver of speedy trial that counsel had previously sent him and requesting that counsel file instead a motion for speedy trial. On December 15, 1998, counsel filed a motion for speedy trial on Moree's behalf. On December 21, 1998, the court denied this motion. The court held no hearing to "determine [counsel's] competency" as Moree had requested.

On January 21, 1999, Moree filed a *pro se* motion seeking appointment of new counsel. In support of the motion, Moree argued that counsel had failed to seek a speedy trial; "failed to prepare the defense case properly;" had not forwarded papers to Moree; and had failed to discuss with him "strategic choices or possible defenses." After receiving a copy of this motion, counsel filed a motion to be relieved.

On January 26, 1999, the court held a hearing on the issue of the effectiveness of counsel's representation. At that hearing Moree informed the judge that counsel had visited him on only a single occasion in jail. He complained about and held counsel responsible for the slow progress of the case. Moree further complained that counsel was "incompetent," "inefficient," had not sent him any "paperwork" about his case and had not adequately explained the case to him. In response, counsel disputed these characterizations. While counsel conceded that he had visited Moree only once *at the jail,* he informed the court that he had had meetings with Moree at the courthouse cellblock. On one of these occasions Moree met with a voice identification expert whom counsel had hired, and they spent several hours preparing a voice authentication exemplar. Counsel also informed the court that he had played all of the wiretap tapes, had gone over all of the transcripts, and was "completely prepared to start trial" having "spent a lot of time preparing."

The court found that counsel had "done everything that [he was] required to do" and that Moree was "attempting to manipulate the court." The court therefore denied both Moree's motion for new counsel and counsel's motion to be relieved.

### C. The Plea Agreement and Allocution

The Assistant United States Attorney had previously faxed counsel a proposed plea agreement. Although counsel had mailed a copy of that agreement to Moree, Moree had not received it at his detention facility. However, on January 26, 1999, following the hearing mentioned above, counsel, the Assistant, and Moree met to discuss the terms of this agreement. Un-

der the proposed agreement, Moree would plead guilty to the count of conspiracy to possess cocaine base and one count of illegal reentry. The government agreed to dismiss the remaining counts at sentencing and to recommend a three level reduction in offense level for acceptance of responsibility. *See* U.S.S.G. § 3E1.1. The parties estimated that the guideline sentencing range on the narcotics charge would be 188 to 235 months, based on Moree's status as a career offender under U.S.S.G. § 4B1.1(B) and his criminal history category of VI. The guideline sentencing range on the illegal reentry charge was estimated at 77 to 96 months. The government agreed to recommend that the sentences run concurrently. The agreement further provided that Moree would not appeal a sentence within the specified guideline range.

Moree then appeared before Magistrate Judge William I. Garfinkel, and pled guilty pursuant to this agreement. At allocution, Moree affirmed that he did not have any difficulty communicating with counsel, that his mind was clear, that he understood the applicable penalties, that he was satisfied with the representation he had received from counsel, and that he had been well-advised and understood everything. The court reviewed the terms of the plea agreement with Moree and determined that Moree understood those terms and the rights he was waiving by agreeing to plead guilty. The court also questioned Moree to make sure that he understood how the Guidelines applied and how they might affect his sentence. The court then assured itself that there was a factual basis for Moree's plea and that Moree agreed with the government's proffered evidence. While Moree contested certain details of the prosecutor's proffer, relating to a count to which he did not plead, Moree affirmed that he had conspired to purchase and then resell the drugs. Based on the allocution, Magistrate Judge Garfinkel found that there was a factual basis for the plea and that Moree "enter[ed] the plea voluntarily, knowingly and of his own free will."

### D. Sentencing

Sentencing was scheduled for April 14, 1999, before Judge Nevas. The presentence report ("PSR") prepared by the Probation Department originally recommended a sentence in the range 188 to 235 months' imprisonment. This was the same range estimated in the plea agreement, and was based on the same assumptions, including that Moree was a career offender under U.S.S.G. § 4B1.1.

Prior to sentencing, however, the Probation Department discovered that the career offender designation was not appropriate. This was because one of Moree's previous narcotics convictions occurred when he was under the age of 18, and the sentence was imposed more than five years before the commencement of the conspiracy in this case. Therefore, this prior conviction generated no criminal history points and could not serve as a career offender predicate. *See* U.S.S.G. §§ 4A1.2(d); 4B1.2(c) & cmt. 3. All parties then agreed that the original career offender designation was incorrect. The proper guideline range was determined to be 135 to 168 months' imprisonment.

At the sentencing hearing, the court inquired of Moree whether he had had the opportunity to discuss the presentence report with his attorney. Moree embarked on a long, rambling response in the course of which he said that both his counsel and the prosecutor had told him that if he rejected the plea, he would be tried and his sentence could be much longer. He claimed that the prosecutor had told him that if he did not plead he would be "leaving the prison system in a body bag." As a result, he claimed he started "getting all scared." He claimed that his attorney had made the agreement with the prosecutor "behind my back" and that "I don't really deserve all this time because it's like he never—" He complained further that having pled to five grams, he should not be

sentenced for more. Moree made no request to withdraw the plea.

Moree's counsel made no response.

Counsel urged the court to grant Moree an adjustment for acceptance of responsibility and argued for leniency. There was no motion for downward departure. The court proceeded to sentence Moree to concurrent terms of 135 months' imprisonment, the bottom of the applicable guideline range.

Defendant, *pro se*, filed notice of appeal. On appeal he is represented by new counsel.

## DISCUSSION

Moree contends he was denied effective assistance of counsel at his sentencing, claims his counsel had a conflict of interest, and seeks a remand for resentencing with new counsel.

■ A defendant who claims that he was denied effective assistance of counsel must ordinarily show that (1) his attorney's performance fell below "an objective standard of reasonableness," and (2) he suffered prejudice. *Strickland v. Washington*, 466 U.S. 668, 688, 693, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Proving prejudice requires an affirmative showing of "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. 2052. However, when the claim of ineffective assistance of counsel is based on an asserted conflict of interest, a less exacting standard applies, and prejudice may be presumed. A defendant is entitled to a presumption of prejudice on showing (1) "an actual conflict of interest" that (2) "adversely affected his lawyer's performance." *Cuyler v. Sullivan*, 446 U.S. 335, 348, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980).

■ While the Supreme Court originally articulated this more lenient standard in cases where the conflict arose between the interests of several co-defendants represented by a single defense counsel, *see, e.g., id.; Holloway v. Arkansas*, 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978); *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), we have consistently applied the *Cuyler* standard in cases where the asserted conflict arises between the interests of the defendant and those of his attorney. *See, e.g., Winkler v. Keane*, 7 F.3d 304, 307 (2d Cir.1993) (actual conflict created where defense lawyer's contingency fee provided a bonus for acquittal). In so doing, we have developed a three-stage analysis. First, the defendant must establish that an actual conflict of interest existed. *See Winkler*, 7 F.3d at 307. An actual conflict of interest arises during representation when "the attorney's and defendant's interests 'diverge with respect to a material factual or legal issue or to a course of action.'" *Id.* (quoting *Cuyler*, 446 U.S. 335, 356 n. 3, 100 S.Ct. 1708 (Marshall, J., dissenting)). Next, the defendant must establish an "actual lapse in representation," *Cuyler*, 446 U.S. at 349, 100 S.Ct. 1708, that resulted from the conflict. An "actual lapse in representation" is demonstrated by the existence of some "'plausible alternative defense strategy'" not taken up by counsel. *Winkler*, 7 F.3d at 309 (quoting *United States v. Gambino*, 864 F.2d 1064, 1070 (3d Cir.1988)). The defendant need not show that the alternative defense "'would necessarily have been successful'" only that it "'possessed sufficient substance to be a viable alternative.'" *Id.* (quoting *Gambino*, 864 F.2d at 1070). Third, the defendant must also show causation—that the alternative defense was "inherently in conflict with or not undertaken *due to* the attorney's other loyalties or interests." *Id.* (quoting *Gambino*, 864 F.2d at 1070) (emphasis added).

Because under *Cuyler* the defendant benefits from a presumption of the prejudice that he must affirmatively prove under *Strickland*, courts have noted the

incentive for defendants to characterize ordinary ineffective assistance of counsel claims as conflict of interest claims. *See United States v. White,* 174 F.3d 290, 296 (2d Cir.1999); *see also Beets v. Scott,* 65 F.3d 1258, 1272 (5th Cir.1995) (en banc) (limiting *Cuyler* standard to conflict of interests arising in context of multiple representation).

■ Moree alleges that an actual conflict of interest existed between him and his counsel. First, Moree contends that when his counsel defended himself against Moree's allegations of professional incompetence and neglect at the January 26 hearing, a conflict resulted. Moree contends that a further conflict arose at the sentencing hearing when Moree criticized counsel's conduct at the time of Moree's plea bargaining. He contends counsel coerced his plea. Moree further contends that this conflict resulted in several lapses in representation, including failure to discern that Moree was not chargeable under the career offender guideline, failure to move for a downward departure and failure to file a notice of appeal. He claims he was denied effective assistance of counsel at his sentencing hearing.

In support of his claims Moree relies heavily on our decision in *Lopez v. Scully,* 58 F.3d 38 (2d Cir.1995). In *Lopez,* the defendant had pled guilty to murder, but prior to his sentencing hearing filed a *pro se* motion seeking to withdraw his plea. *See id.* at 40. Lopez alleged in his motion that his attorney had induced his plea through " 'threats and coercion, and misinformation.' " *Id.* Lopez also alleged that his attorney had failed to prepare adequately for trial and had not answered his correspondence. *See id.* At the sentencing hearing, Lopez's attorney responded by denying Lopez's allegations of misconduct. *See id.* The court summarily denied Lopez's *pro se* motion. At sentencing, Lopez's attorney did not speak on his behalf, stating that he would " 'leave sentencing where it properly belongs, in the hands of the court.' " *Id.* On Lopez's appeal from the denial of his habeas corpus petition, we found that Lopez's trial counsel had labored under an actual conflict of interest. We stated that the conflict arose when Lopez accused his attorney of having coerced his plea. *See id.* at 41. Citing *United States v. Ellison,* 798 F.2d 1102, 1107 (7th Cir.1986), we noted the tension that would require the attorney either to admit serious ethical violations, possibly subjecting him to liability for malpractice, or to contradict his client in a manner that would undermine the client's effort to overturn his conviction. *See id.*

In *United States v. White,* 174 F.3d 290 (2d Cir.1999), we refined the issues raised by *Lopez.* The defendant in *White* was found guilty by a jury of bank fraud. At a hearing to resolve various sentencing issues, he requested substitute counsel, criticizing his attorney's decision not to call a witness and faulting her for failure to file motions for judgment of acquittal and for a new trial based on newly discovered evidence. *See id.* at 292. White's attorney requested and was granted an opportunity to respond to these criticisms in open court. Her response contradicted her client's assertions. *See id.* The judge denied White's request for substitute counsel. *See id.* White again criticized his attorney at the final sentencing hearing, alleging that she had been " 'ineffective at trial' " because she had failed to object to evidence, had failed to subpoena records, and had not introduced certain evidence at trial. *Id.* at 293. Again, the attorney responded to these allegations. She explained her decision not to introduce evidence by suggesting that to have done so would have opened the door to " 'more incriminating evidence against Mr. White.' " *Id.* She explained her decision not to call one witness by indicating to the court that the witness had told her " 'something that was incriminating about [White's] case.' " *Id.* Before sentencing White, the court asked whether his attorney had anything to say on White's behalf. *See id.* at 294. White's attorney refer-

enced the papers that she had submitted and the oral arguments she had made at the earlier sentencing hearing and stated that she had "nothing to add." *Id.*

On appeal from his sentence, relying on *Lopez*, White alleged that an actual conflict of interest had arisen when his attorney was faced with the choice of defending herself against White's allegations of professional incompetence or supporting White's requests for substitute counsel, thereby "subjecting herself to liability for malpractice." *White*, 174 F.3d at 295. White contended that this led directly to lapses in representation when his attorney contradicted him in open court, told the court that more incriminating evidence existed, and twice declined opportunities to argue for leniency. *See id.*

We disagreed and affirmed the sentence. We noted that such disputes between defendant and counsel are commonplace and "often culminate in a defendant's request for substitute counsel." *Id.* at 296. We made clear that "an actual conflict of interest" does not necessarily arise every time that an attorney responds to allegations of incompetent representation or contradicts his client in open court. *See id.* Recognizing that a trial court has the obligation to enquire into the basis of substantial complaints regarding counsel's performance, we declined to adopt a broad rule that would give a defendant the unilateral power to establish a "conflict of interest" simply by "expressing dissatisfaction with his attorney's performance." *Id.* We concluded that under these circumstances the *Strickland* standard, requiring an affirmative showing of both objectively unreasonable performance and prejudice, remained the appropriate measure of counsel's effectiveness. *See id.* at 296.

In *White*, we distinguished *Lopez* by indicating that "crucial" to the finding of a conflict in that case was Lopez's claim that his attorney had "coerced him into pleading guilty." *White*, 174 F.3d at 296. The *White* opinion characterized the claim that the attorney coerced the defendant's plea

as "extremely serious and, we would hope, unusual." *Id.* We contrasted the *Lopez* claim that the defendant had pled guilty by reason of his attorney's coercion (which under *Lopez* creates a conflict of interest), with the more conventional complaint of a defendant represented by an assigned attorney that his lawyer is refusing "to file certain motions, to pursue certain evidentiary leads, to object to the introduction of certain evidence ... and to call certain witnesses...." *Id.* *White* concluded that unlike a claim that the defendant had pled guilty by reason of his attorney's misconduct, the more common complaints defendants make in efforts to be rid of an appointed attorney do not give rise to a conflict of interest, even though the attorney may contradict the defendant's allegation in responding to the accusation. *See id.* Allegations of the latter nature are judged by the *Strickland* standard, which requires a showing of prejudice, and not by the *Cuyler* standard, which does not.

Defendants for whom attorneys have been appointed under the Criminal Justice Act very commonly complain to the court in the early stages of the representation in an effort to have a new attorney appointed. It is commonplace for such a defendant to allege that the attorney is not paying sufficient attention to his case, has not come to see him in prison, has not undertaken sufficient investigation, is not making necessary motions, is not calling witnesses, or is trying to induce the defendant to plead guilty. If the mere making of such an accusation, regardless of lack of justification, *ipso facto* resulted in a conflict of interest because the attorney cannot defend himself without contradicting his client, district courts would lose control of the criminal cases before them. Defendants represented by appointed attorneys would effectively be able to change attorneys at will. Judges could be prevented from starting trials, and trials conducted by an attorney who had been previously accused of such dereliction would be sub-

ject to subsequent invalidation on the theory that the defendant was represented at trial by an attorney who had an actual conflict of interest. *White* accordingly made a point of distinguishing such accusations from the accusations in *Lopez* and *Ellison* that the defendant's plea was procured by his attorney's misconduct.

Moree contends that, like the defendant in *Lopez*, he has demonstrated an actual conflict of interest. Analysis of Moree's charges in the light of *Lopez* and *White*, however, leads us to conclude that they did not place the lawyer in a conflict of interest. This is clearly so as to Moree's pre-pleading complaints (reviewed in Part B above) that counsel failed to move for speedy trial, failed to prepare adequately, failed to forward papers, and failed to discuss strategic choices, etc. Those allegations clearly fall within the category identified by *White* as not creating a conflict of interest, and not within the *Lopez* category of having coerced or improperly induced the defendant's plea.

We reach the same conclusion for different reasons as to Moree's accusation made at the sentencing hearing about the circumstances of his plea. In *Lopez*, the defendant accused his attorney of having procured his plea through " 'threats and coercion and misinformation.' " *Lopez*, 58 F.3d at 40. In this appeal, in an effort to bring his complaints within the *Lopez* rule, Moree now describes his complaint as having been one of "coercion." In fact, at sentencing, he did not accuse his attorney of having coerced him to plead, or indeed of any misconduct. His disjointed narration in response to the judge's inquiry whether he had discussed the presentence report with his attorney included that his attorney advised him he was offered a plea agreement for 188 to 235 months, that they went to talk to the prosecutor because it was "too much," that the prosecutor had told him if he didn't like the plea offered, he would "be leaving the prison system in a body bag," that he was scared, that his attorney told him the plea agree-

ment was "a good thing. We go to trial, they give you thirty years," that he "should plead to five grams," and that his attorney had made the deal with the prosecutor for the plea agreement "behind my back."

While Moree unquestionably was expressing unhappiness, he did not accuse his attorney of misconduct, much less of having coerced his plea. Although the words "behind my back" seek to impart a pejorative implication, defense attorneys conventionally discuss the prosecutor's offer of a plea agreement out of the defendant's presence. That is not misconduct. That the attorney advised him to take the offer and warned him that his failure to do so would lead to a thirty year sentence merely asserts that the lawyer gave professional advice as to what the consequences of his choice might be. The defendant's statement that he was "scared" is understandable, but is not attributed to any misconduct of his attorney. Counsel was not obliged, as in *Lopez* and *Ellison*, to choose between accusing himself of misconduct or defending himself against his client's accusations at the cost of undermining his client's motion to have his plea set aside. This is for two reasons. The first is that, as noted above, counsel was not accused of misconduct. In fact, at the sentencing hearing the attorney said nothing to rebut Moree's claims. The second *reason is that when Moree made these statements about his attorney, he was not applying to the court for revocation of his plea.* Thus, even if counsel had contradicted any of Moree's assertions, he would not have been hindering his client's application for relief.

We conclude that Moree has failed to demonstrate that his lawyer had a conflict of interest at his sentencing. Moree's claim is one of ineffective assistance of counsel and is assessed under the *Strickland* standard. Moree has failed to show either that his attorney's conduct fell below an objective standard of reasonableness or that he suffered prejudice.

## CONCLUSION

The judgment of conviction is affirmed.