UNITED STATES of America,

v.

Michael BERGER, Defendant.

No. 00 CR. 877(VM).

United States District Court,
S.D. New York.

Jan. 25, 2002.

Order Denying Reconsideration
Feb. 12, 2002.

Mei Lin Kwan–Gett, U.S. Attorney's Office, New York City, for United States.

### DECISION AND ORDER

MARRERO, District Judge.

Defendant Michael Berger (hereinafter "Berger") pled guilty on November 27, 2000 to one count of a two-count information charging securities fraud in violation of § 10(b) of the Securities Exchange Act of 1934, codified at 15 U.S.C. § 78j(b). On September 24, 2001, Berger filed a motion to withdraw his guilty plea, arguing, *inter alia*, that at the time he entered his guilty plea: (1) he lacked the capacity to voluntarily, knowingly and intelligently plead guilty; (2) the Court failed to conduct a sufficient inquiry into his alleged mental condition and its impact on his competence to plead; (3) he was provided ineffective assistance of counsel; and (4) his plea agreement with the Government contained a material misstatement of the fine range applicable to the charged offense. Oral argument in connection with the motion was heard on January 3, 2002. For the reasons set forth below, Berger's motion is denied.

### I. FACTUAL BACKGROUND

#### A. THE DEFENDANT

Michael Berger was born on November 13, 1971 in London, England and grew up in Salzburg, Austria. (*See* Forensic Psychological Report of Dr. Sanford L. Drob, dated October 4, 2000 (hereinafter "Drob's Report"), at 7.) From 1990 to 1993, Berger studied macroeconomics at Johannes Kepler University in Linz, Austria. (*Id.* at 9.) In 1993, he left the university and came to New York to work for Financial Asset Management, Inc. (hereinafter "FAM"), a securities broker-dealer which maintained its headquarters in Columbus, Ohio. (*Id.*)

In August 1995, Berger, then 24 years old, established an investment company named the Manhattan Investment Fund Limited (hereinafter the "Hedge Fund"). (*See United States v. Michael Berger*, Information 00 Cr. 877, filed August 23, 2000 (hereinafter the "Information"), ¶ 4.) Berger served as one of three directors of the Hedge Fund. (*Id.* ¶ 3.) Berger managed the day-to-day operations of the Hedge Fund through Manhattan Capital Management, Inc. (hereinafter "MCM"), an investment company of which Berger was the President, Secretary and one hundred percent shareholder. (*See* Information ¶ 3 and Presentence Investigation Report, *United States v. Michael Berger*, Probation Office, United States District Court, Southern District of New York, dated April 18, 2001 (hereinafter the "PSR"), ¶¶ 7–11.) MCM had approximately six employees and maintained its headquarters at 410 Park Avenue, New York, New York. (Information ¶¶ 2, 3.)

#### B. THE GOVERNMENT'S INVESTIGATION

In December 1999, representatives from the United States Securities and Exchange Commission (hereinafter the "SEC") requested that Berger produce certain documents relating to the Hedge Fund. (Affidavit of Michael Berger, dated September 24, 2001 (hereinafter "Berger Aff."), ¶ 4.) Sev-

eral weeks later, Berger retained the law firm of Wilkie, Farr & Gallagher (hereinafter "Wilkie"). Benito Romano, Esq. (hereinafter "Romano"), of Wilkie served as his primary counsel. Berger asserts that, pursuant to Romano's advice, he met and cooperated with representatives from the United States Attorney's Office (hereinafter the "USAO") and the SEC several times over the following three months, from January to March of 2000. (Berger Aff. ¶ 5.) On or about March 30, 2000, Romano advised Berger that he could no longer represent him due to a recently discovered conflict of interest. (Berger Aff. ¶ 12.)

In April 2000, Berger retained the law firm of Morvillo, Abramowitz, Grand, Iason & Silberberg, P.C. (hereinafter "Morvillo"). Paul Grand, Esq. (hereinafter "Grand"), and Sara Mogulescu, Esq. (hereinafter "Mogulescu"), served as Berger's primary counsel. Allegedly acting upon Grand's advice, Berger continued meeting with representatives from the USAO and the SEC. In spite of Berger's attempts to cooperate, the Government declined to enter into a cooperation agreement with him.

## C. THE CIVIL CASE AGAINST BERGER

On January 18, 2000, the SEC commenced a civil enforcement proceeding against Berger, the Hedge Fund, and MCM, alleging violations of various securities laws. *See Securities and Exchange Commission v. Berger*, No. 00 Civ. 333, 2001 WL 1403028,*1 (S.D.N.Y. Nov. 13, 2001) (Cote, J.) (hereinafter *"SEC v. Berger"*).[1] The next day, on January 19, 2000, the Court in that case appointed a receiver (hereinafter "the Receiver") for defendants MCM and the Hedge Fund. *Id.* According to Berger, the Receiver designated was recommended by Romano and allegedly had a friendly relationship with Romano and later with Grand. In March 2000, the Receiver caused the Fund and MCM to file voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. *Id.* On April 10, 2000, the United States Bankruptcy Court for the Southern District of New York approved the appointment of the Receiver as Chapter 11 Trustee for MCM and the Hedge Fund. *Id.*

## D. THE GOVERNMENT'S CHARGES AGAINST BERGER

On August 24, 2000, Berger waived indictment and entered a plea of not guilty to the two counts contained in the Information. Count One of the Information charged that from September 1996 through January 2000, Berger, in connection with the purchase and sales of securities, made false representations and material omissions regarding the performance and financial status of the Hedge Fund to its investors, administrator and auditors, in violation of § 10(b), 15 U.S.C. § 78ff, Rule 10b–5, and 18 U.S.C. § 2. Count Two of the Information charged that from September 1996 through January 2000, Berger, acting as an investment adviser, made false representations and material omissions regarding the Hedge Fund's perfor-

---

1. In an Opinion and Order dated November 13, 2001 (hereinafter the "November 2001 Order"), the Court granted a motion for summary judgment filed by the SEC against Berger and ordered that Berger: (1) be permanently enjoined from violating various securities laws, including Section 10(b) of the Securities Exchange Act of 1934, codified at 15 U.S.C. § 78j(b) (hereinafter "§ 10(b)"), and 17 C.F.R. § 240.10b–5, promulgated thereunder (hereinafter "Rule 10b–5"), (2) disgorge $20,007,233, and (3) pay a civil penalty of $100,000. *See id.* at *10. Before the Court issued its November 2001 Order, the SEC and MCM had agreed to a settlement of the SEC's claims against MCM. *Id.* Final judgment was entered against MCM on October 9, 2001. *Id.*

mance and financial status to its investors, administrator and auditor, in violation of 15 U.S.C. §§ 80b–6(1), 80b–6(2), and 80b–17, and 18 U.S.C. § 2.

Specifically, the events and Berger's role in them, as set forth in the Information, allege that in August 1995, Berger established the Hedge Fund, incorporating it under the laws of the Territory of the British Virgin Islands. (Information ¶¶ 1, 4.) In April 1996, Berger began selling shares in the Hedge Fund through a confidential offering memorandum. (*Id.* ¶ 4.) According to the confidential memorandum, the Hedge Fund employed a short to intermediate contrarian investment strategy based on a premise that the stock market, particularly technology and Internet related stocks, was overvalued and that a market correction would soon cause a decline in stock prices. (*Id.* ¶¶ 4, 5.) However, because the prices of most of the stocks in which Berger invested for the Hedge Fund continually rose, the Hedge Fund consistently suffered losses. (*Id.* ¶ 5.)

The Hedge Fund maintained a brokerage account at FAM. (*Id.* ¶ 7.) FAM, in turn, cleared all of the Hedge Fund's trades through FAM's clearing broker, Bear Stearns Securities Corporation (hereinafter "Bear Stearns"). (*Id.*) The Hedge Fund contracted with Fund Administration Services (Bermuda) Limited (hereinafter the "Administrator"), an affiliate of Ernst and Young, to administer certain aspects of the Hedge Fund, including sending monthly account statements and letters from Berger to the Hedge Fund's investors. (*Id.* ¶ 9.) Prior to sending the monthly account statements to investors, the Administrator calculated the Hedge Fund's net asset value (hereinafter "NAV") and the market value of each investor's shares in the Hedge Fund. (*Id.* ¶ 9.)

Starting in September 1999, in order to conceal losses suffered by the Hedge Fund, Berger created false account statements for the Administrator. (*Id.* ¶ 10.) Although the Administrator received accurate account statements from Bear Stearns, Berger sent fabricated FAM statements with inflated numbers to the Administrator and told the Administrator that because Bear Stearns held only a fraction of the Hedge Fund's portfolio, it should disregard Bear Stearns's statements. (*Id.* ¶ 12.) Following Berger's instruction, the Administrator used the false FAM account statements to calculate the market value of each investor's shares. (*Id.*) As a result of these calculations, from September 1996 to December 1999, the Administrator sent the Hedge Fund's investors monthly statements that grossly exaggerated the Hedge Fund's performance and market value. (*Id.*)

In addition, Berger also concealed the Hedge Fund's losses from its auditors, Deloitte and Touche (Bermuda) (hereinafter "Deloitte"). (*Id.* ¶ 15.) From May 1997 to March 1999, Berger sent Deloitte fabricated financial information about the Hedge Fund but made it appear as if the information was being sent or faxed directly from FAM. (*Id.*) Working from the false information that it received from Berger, Deloitte issued unqualified audit reports for the years 1996, 1997, and 1998. (*Id.* ¶ 16.) During this time, Berger also distributed information, such as confidential offering memoranda, to prospective investors. (*Id.* ¶ 17.) Some of this information misrepresented the performance of the Hedge Fund, claiming that it had achieved substantial returns, when, in fact, it had incurred significant losses. (*Id.*) The discrepancies were significant, as illustrated in the following chart cited by the Government:

| Year | False Asset Number Provided by BERGER | Actual Assets Held at Bear Stearns |
|------|------|------|
| 1996 | $ 17.9 million | $ 5.6 million |
| 1997 | $ 91.5 million | $39.3 million |
| 1998 | $263.2 million | $ 3.9 million |
| 1999 | $515.3 million | $27.7 million |

(*See* Government's Memorandum of Law in Opposition to the Defendant Michael Berger's Motion to Withdraw his Plea, dated November 9, 2001 (hereinafter "Govt.'s Memo"), at 5 (citing the PSR ¶ 22)). According to the Government, the Hedge Fund's appearance of financial success induced clients to make heavier investments. (*Id.*) Berger reportedly received over $575 million from at least 300 investors in the Hedge Fund from April 1996 through January 2000. At the same time, the Hedge Fund suffered losses in excess of $400 million. (*Id.*)

In December 1999, Deloitte informed the Hedge Fund that it was modifying its audit procedures and requested further documentation about the Hedge Fund's finances. (*Id.* ¶ 18.) As a result, Berger fired Deloitte on January 6, 2000 and Deloitte withdrew the audit opinions that it had issued for 1996, 1997 and 1998. (*Id.*) On January 12, 2000, the Administrator terminated its agreement with Berger, after determining that he had provided it with false financial information. (*Id.* ¶ 19.)

### E. *THE PLEA AGREEMENT*

On November 10, 2000, Berger and Grand signed a plea agreement with the Government. (*See* Letter from Mei Lin Kwan–Gett to Paul Grand, dated November 8, 2000 (hereinafter the "Plea Agreement").) Under its terms, Berger agreed to plead guilty to Count One of the Information. In return, the Government agreed that it would not further prosecute Berger, with the exception of criminal tax violations, for any securities fraud he allegedly committed while working for the Hedge Fund and MCM from September

1996 through January 2000. The Government also agreed to dismiss Count Two of the Information at the time of Berger's sentencing. The Plea Agreement stated that the applicable sentencing range under the United States Sentencing Guidelines (hereinafter the "Guidelines") was 70 to 87 months imprisonment. Berger reserved the right to argue that a downward departure from the Guidelines sentencing range is warranted on the basis that he had a "significantly reduced mental capacity," and the Government reserved the right to oppose such a departure. (*Id.* at 3.)

The Plea Agreement also stated that, "[i]t is understood that the sentence to be imposed on the defendant is determined solely by the Court." (*Id.* at 4.) In addition, the parties understood that Berger would "have no right to withdraw his plea of guilty should the sentence by the Court be outside the Guidelines range set forth [in the Plea Agreement]." (*Id.*) Berger acknowledged that "he has accepted [the] Plea Agreement and decided to plead guilty because he is in fact guilty." (*Id.* at 5.)

In the Plea Agreement, Berger also waived "any and all right[s] to withdraw his plea or to attack his conviction, either on appeal or collaterally, on the ground that the Government [ ] failed to produce any discovery material, exculpatory material pursuant to *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and impeachment material pursuant to *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), that ha[d] not already been produced as of the date of the signing of [the] Agreement." (*Id.*)

### F. *BERGER'S GUILTY PLEA*

In a hearing before this Court on November 27, 2000 (hereinafter the "Plea Hearing"), Berger withdrew his plea of not

guilty to Count One of the Information and entered a plea of guilty. Before the Court accepted his plea, Berger was placed under oath and he solemnly swore that he would truthfully answer all questions asked by the Court for purposes of the proceeding. (*See* Transcript of Plea Hearing of Michael Berger on Information Number 00 Cr. 877, dated November 27, 2000 (hereinafter "Plea Tr."), at 3.)

### 1. The Court's Inquiry Into Berger's Competence

At the beginning of the proceeding, the Court asked Berger whether he was then under the care of a doctor or psychiatrist. Berger responded that since March of 2000, he had been receiving "therapy related to family circumstances". (Plea Tr. at 3–4.) When the Court asked whether his treatment had been successful, Berger replied, "I think my doctor would be able to answer better than I am. I cannot tell whether it was successful or not, in particular because it was not an illness of a physical nature." (*Id.* at 4.) Berger acknowledged that his mind was clear and that he was feeling well.

The Court then asked whether either counsel had any doubts as to Berger's competence to plead. Both the Assistant United States Attorney present (hereinafter the "AUSA") and Grand replied that they did not. The Court asked Berger whether he had had a "full opportunity to discuss [his] case with [his] attorney and to discuss the consequences of entering a plea of guilty to the charge set forth in the Information." (*Id.* at 6.) Berger replied that he had done so with his current counsel. (*Id.*)

The Court asked Berger if he was satisfied with his attorney. Berger replied that he was satisfied with the attorney representing him at that time but had not been satisfied with his previous counsel. (*Id.*)

The Court again asked Berger if he was "satisfied with the current counsel with whom" he had "consulted regarding the plea" that he was entering. *Id.* Berger replied that he was. (*Id.*) On the basis of Berger's responses to the Court's questions and the Court's observations of Berger's demeanor, the Court concluded that Berger was fully competent to enter an informed plea. (*Id.*)

### 2. The Plea Agreement

The Court asked a number of questions to determine whether Berger understood the Plea Agreement that he had entered into with the Government. Berger acknowledged that: (1) he had reviewed the Plea Agreement when he signed it; (2) he had discussed it with his attorney; (3) he fully understood it; and (4) it constituted a "complete and total understanding of the entire agreement" between the Government and him and his attorney. (Plea Tr. at 15.) When the Court asked Berger whether anything might have been left out of the Plea Agreement, Berger replied, "I think it's complete in all material respects." (*Id.*)

### 3. Factual Basis for Accepting Berger's Guilty Plea

The Court read Berger the elements of the offense contained in Count One of the Information. (*Id.* at 10–11.) Berger acknowledged that he understood the allegations in Count One and that the Government would have to prove every element of the charge beyond a reasonable doubt if his case were to go to trial. (*Id.* at 11.) Berger further acknowledged that he understood that the maximum possible penalty for his alleged offense included, among other things, ten years' imprisonment and a fine of the greatest of three figures: (1) $ 1 million; (2) twice the gross financial gain that he derived from the offense; or

(3) twice the gross financial loss to other persons resulting from his offense. (*Id.* at 11.)

The Court asked Berger to state in his own words what he did in connection with the crime to which he was entering a plea of guilty. Berger replied as follows:

> Your Honor, between 1996 and 2000, I was the sole principal of Manhattan Capital Management, which acted as investment manager for an offshore fund called Manhattan Investment Fund. The fund had a contrarian strategy and was buying and selling short stocks. I believed, starting in late 1996, that the market and in particular technology and Internet-related stocks were grossly overvalued, and at this point, the market turned against me and caused the fund to incur significant losses.
>
> For a variety of reasons, I was unable and not capable to admit the amount of those losses, and caused others to issue misleading statements to investors. I severely regret those actions. I apologize here to all investors, and I wish that what happened never would have happened. And I also would like to add that the words that I'm sorry and I apologize cannot fully embrace the magnitude of what has happened and how bad I feel about the situation. And I think that, you know, this is the actions that I have undertaken and this is what I'm guilty of.

(*Id.* at 21.)[2] The Court asked Berger if the acts he described were committed or caused to be committed in the Southern District of New York. Berger replied, "[t]hey were caused to be committed by me in this district, yes." (*Id.* at 22.)

The Court also asked Berger whether he knew that his conduct was wrong and illegal at the time he committed these acts. Berger replied, "I realize now that it was, and I closed my eyes in doing what I did. I firmly believed that my strategy would work out, and I felt that the end would justify the means. And I now realize that that was severely wrong." (*Id.*) To clarify, the Court asked, "At the time you were doing these things, did you believe it was wrong and illegal, when you were causing material information to be sent out that was false?" Berger replied, "I believed that no one else but me would apply the same standards of, you know, of that information, other than me." (*Id.* at 23.)

Having heard the Court inform him of his rights at trial, of the consequences of pleading guilty, of the maximum sentence that he may face and of the civil rights he may lose, Berger entered a plea of guilty to Count One of the Information. (*Id.* at 25.) Near the end of the proceeding, the AUSA stated that with respect to Berger's allocution, she sought clarification as to whether Berger had sufficiently admitted that he knew at the time he committed the

---

**2.** In addition, Grand read a plea allocution into the record that was prepared by Grand and Berger:

> Over the period of several years, I was the manager of the Manhattan Investment Fund, an offshore hedge fund. During that time, I caused false statements to be generated for the fund, which had the effect of misrepresenting its performance to investors, including potential investors who invested based on false information.
>
> I came here today not only to plead guilty but to express my apologies to all of the

shareholders in the fund and to tell you that I am extremely sorry for what I did. My misrepresentations arose out of my conviction that the technology sector was overpriced and my inability to face the fact that my strategy of selling short technology stocks was not working. I was unable to change my course no matter how long the market moved against me or how great the losses were. Throughout, it was my hope that I would ultimately make money for investors.

conduct that it was wrong. (*Id.* at 27.) As a result, the Court questioned Berger again to confirm that he knew that his conduct was unlawful at the time he committed the acts in question.[3] (*Id.* at 28.)

The Court scheduled Berger's sentencing for April 30, 2001. On April 18, 2001, the Probation Office issued a Presentence Investigation Report to assist the Court in determining Berger's sentence. (PSR at 1.) The PSR recommended that the Court impose a sentence of 87 months of incarceration followed by supervised release for two years and restitution in the amount of $423,600,000. (PSR at 24.)

## G. *BERGER'S PSYCHOLOGICAL EVIDENCE*

Prior to Berger's Plea Hearing on November 27, 2000, his counsel referred him to Dr. Sanford L. Drob (hereinafter "Drob") for psychological examination and testing in connection with the charges the Government had brought against him. Drob conducted a psychological examination, performed psychological tests, interviewed numerous people who knew Berger, including his psychiatrist at the time, Dr. Joshua Dorsky (hereinafter "Dorsky"), family members and business associates, and issued a report. (*See* Drob's Report at 1.) In his report, Drob opined:

> It is my forensic psychological opinion that Michael Berger suffered from a reduced mental capacity that contributed very significantly to the commission of the offense for which he had been charged. While Mr. Berger was, in my opinion, cognizant of the nature and wrongfulness of his behavior at the time of the offense, he suffered from a reduced mental capacity that distorted his view of his circumstances and created a quality of rigid compulsivity to his offense conduct.

(*Id.*) At the time Drob issued his report, Berger's Plea Hearing was scheduled to occur approximately eight weeks later. Yet, Drob's Report contains no mention of Berger's incompetence to enter a plea of guilty. In fact, Drob's opinion that Berger was "cognizant of the nature and wrongfulness of his behavior" (*id.*) is consistent with the Court's conclusion that Berger (1) was competent to enter a guilty plea on November 27, 2000, and (2) knew that his conduct was wrongful at the time he committed the acts in question. In addition, the section of Drob's Report on Berger's "Mental Status and Clinical Presentation" indicates that Berger was "oriented to time, place, and person"; "aware of the purpose of the examination"; that his thinking was "goal directed and coherent"; his responses were "appropriate to the context"; his speech, grammar and comprehension were all "appropriate" for Berger's college level education; and that Berger's "insight and judgment [were] fair." Although Drob diagnosed Berger as having several personality disorders, he neither suggested that Berger was unable to understand the Government's charges against him nor that Berger was unable to

---

**3.** THE COURT: Mr. Berger, I asked you the question, do you recall whether, at the time that you were committing these acts or causing others to commit the acts in question, whether you knew that they were wrong and illegal. You somewhat qualified your answer by saying that you now know that they were. But we are talking about at the time that you committed these acts. Did you know that they were wrong and illegal?

THE DEFENDANT: I knew that they were against any principles that applied in the industry, yes.
THE COURT: No. That is not the same thing as law.
MR. GRAND: Unlawful.
THE DEFENDANT: They were unlawful, yes.
THE COURT: You knew that they were unlawful?
THE DEFENDANT: Yes.

assist in the preparation of his defense to those charges.

After Berger pled guilty in November 2000, at the request of the Government, Dr. Stuart B. Kleinman (hereinafter "Kleinman") examined Berger and issued a forensic psychological report on February 23, 2001 (hereinafter "Kleinman's Report"). The report was prepared, in part, for Berger's sentencing in anticipation of a request for a downward departure from the Sentencing Guidelines range based on a "significantly reduced mental capacity." (*See* Plea Agreement at 3.) Although Kleinman agreed with Drob that Berger had a personality disorder that warranted psychological treatment, he opined that Berger's personality disorder "does not produce a significantly reduced mental capacity, and did not render him incapable of choosing other than to commit the instant offense." (Kleinman's Report at 11.)

Approximately seven months later, shortly before Berger filed the instant motion, his former treating psychiatrist, Dr. Joshua I. Dorsky (hereinafter "Dorsky") signed a two and a half page affidavit. (*See* Affidavit of Joshua I. Dorsky, dated September 14, 2001 (hereinafter "Dorsky's Aff.").) In the affidavit, Dorsky stated that Berger suffered from several personality disorders "stemming from his extremely traumatic childhood." (Dorsky's Aff. at 1.) Dorsky recounted that Berger "expressed fear that he would be abandoned by Mr. Grand [his counsel at the time of his guilty plea] if he did not follow Mr. Grand's advice to plead guilty." (*Id.* at 2.) According to Dorsky, "Mr. Berger was so driven to please his attorneys that his fear of disappointment clouded his judgment." (*Id.* at 3.) Finally, Dorsky concluded that, as a result of Berger's personality disorders, he believed that Berger "was not capable of making a ra-

tional decision to plead guilty to the counts alleged in the Information." (*Id.*)

The final piece of psychological evidence in the record in connection with the instant motion is a nine-page affidavit that Drob signed on November 24, 2001 (hereinafter "Drob's Aff."). In his affidavit, Drob stated: "In two previous reports I have so opined that [Berger] did indeed suffer from ... a diminished mental capacity. I did not believe, nor do I believe now that Mr. Berger was incompetent to stand trial or to enter a guilty plea in this case." (Drob's Aff. at 8.) Drob concluded that although Berger was "technically competent to enter a plea in November 2000 ..., he very likely pled guilty without actually believing in his guilt." (*Id.* at 9.)

## H. *MORVILLO'S WITHDRAWAL AS BERGER'S COUNSEL AND THE INSTANT MOTION*

In an Order dated April 6, 2001, the Court granted a motion by Morvillo to withdraw as Berger's counsel in light of the "irreconcilable differences" between them concerning legal strategies described by counsel and acknowledged by Berger during a pre-trial conference the day before. In its Order, the Court also adjourned the date for Berger's sentencing. Some time in May or June of 2001, Berger retained the law firm of Kronish, Lieb, Weiner, and Hellman (hereinafter "Kronish"). Steven Cohen, Esq. (hereinafter "Cohen"), who acted as Berger's primary counsel, informed the Court on July 30, 2001 of Berger's intention to move to withdraw his guilty plea.

In a conference before the Court on August 14, 2001, Cohen moved to withdraw as Berger's counsel. Cohen informed the Court that there had been a "breakdown" in his ability to perform as Berger desired and that he did not think he could continue representing Berger in good-faith because

he did not believe he would fully present "the arguments that [Berger] desired to be brought before the Court." (August 14, 2001 Pre-trial Conference Tr. at 3.) Although the Court granted Cohen's motion, it informed Berger that if he attempted to change counsel again, "it would be the Court's contemplation at that point to designate counsel" for Berger. (*Id.* at 9.) On September 24, 2001, Joseph Bondy, Esq., Berger's present counsel, filed the instant motion and on January 3, 2002, the Court heard oral argument (hereinafter "Oral Arg.") on the motion.

## II. *DISCUSSION*

A defendant's motion to withdraw his guilty plea is governed by Federal Rule of Criminal Procedure 32(e). *See United States v. Torres,* 129 F.3d 710, 715 (2d Cir.1997) (citing *United States v. Reyes,* 13 F.3d 638, 639 (2d Cir.1994)). Although Rule 32(e) provides that a defendant may move to withdraw a guilty plea on "a showing of a 'fair and just reason,' it is basic that 'a defendant has no absolute right to withdraw his guilty plea.'" *Id.* (quoting *United States v. Williams,* 23 F.3d 629, 634 (2d Cir.1994)).

This rule is grounded on sound public policy considerations. As the Second Circuit has stated: "[S]ociety has a strong interest in the finality of guilty pleas," and allowing withdrawal of pleas not only "undermines confidence in the integrity of our judicial procedures," but also "increases the volume of judicial work, and delays and impairs the orderly administration of justice." *United States v. Maher,* 108 F.3d 1513, 1529 (2d Cir.1997) (citing *United States v. Sweeney,* 878 F.2d 68, 70 (2d Cir.1989)); *see also United States v. Burnett,* 671 F.2d 709, 712 (2d Cir.1982). Moreover, the fact that a defendant has changed his mind upon reevaluating either the Government's evidence or the penalty he faces is not a sufficient reason to permit the withdrawal of a guilty plea. *See United States v. Gonzalez,* 970 F.2d 1095, 1100 (2d Cir.1992), *see also United States v. Hughes,* 325 F.2d 789, 792 (2d Cir.1964) (holding that a belated claim of innocence was not sufficient to require granting of motion to withdraw a guilty plea).

The defendant bears the burden of showing that relief should be granted. *See United States v. Hirsch,* 239 F.3d 221, 225 (2d Cir.2001) (citing *United States v. Avellino,* 136 F.3d 249, 261 (2d Cir.1998)). When considering a motion to withdraw a guilty plea, if the defendant has set forth "sufficient grounds" to withdraw the plea, a court should consider potential prejudice to the government. *Id.* (citing *Torres,* 129 F.3d at 715). Otherwise, the issue of prejudice to the Government is irrelevant. *Id.* A court's refusal to allow withdrawal of a guilty plea will be reviewed for an abuse of discretion. *Id.*

In the instant case, Berger sets forth numerous grounds he asserts are sufficient to require that the Court allow him to withdraw his guilty plea. These grounds may be summarized as follows: that (1) he lacked the capacity to voluntarily, knowingly and intelligently plead guilty; (2) the Court failed to conduct a sufficient inquiry into his mental condition; (3) he was provided ineffective assistance of counsel; (4) the Plea Agreement with the government contained a material misstatement of the fine range applicable to the charged offense; and (5) the Court lacked subject matter jurisdiction over the alleged offenses in the Information. For the reasons discussed below, the Court finds that none of the grounds asserted by Berger constitute a fair and just reason to sustain his motion.

## A. BERGER'S COMPETENCE AT THE TIME HE ENTERED HIS GUILTY PLEA

Berger asserts that, due to his mental health condition, he was not competent to enter a guilty plea when he appeared before the Court on November 27, 2000. He argues that a number of factors prevented him from knowingly and willingly pleading guilty to Count One of the Information. Those factors allegedly included: (1) Berger's "pathological need for approval from others," including "accommodation of individuals whom he believes are exploiting him;" (2) his "intense fear of abandonment;" and (3) his "unrealistic self-appraisal and inability to perceive the larger significance of decisions that he makes." (Defendant Michael Berger's Memorandum of Law in Support of Motion to Withdraw Guilty Plea, dated September 24, 2001 (hereinafter "Def.'s Mem."), at 15–16.) In addition, Berger asserts that new psychological evidence, produced after he entered his guilty plea, raises sufficient doubts about his past competence to warrant a hearing before the Court.

■ A defendant is competent to plead guilty if he has: "(1) sufficient present ability to consult with his lawyers with a reasonable degree of rational understanding and (2) a rational as well as factual understanding of the proceedings against him." *United States v. Nichols*, 56 F.3d 403, 411 (2d Cir.1995) (quoting *Dusky v. United States*, 362 U.S. 402, 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960)). *See Godinez v. Moran*, 509 U.S. 389, 399, 113 S.Ct. 2680, 125 L.Ed.2d 321 (1993) (holding that competence standard for a defendant to plead guilty is the same as the standard for a defendant to stand trial). In federal courts, competence is determined by a preponderance of the evidence. *See United States v. Morrison*, 153 F.3d 34, 46 (2d Cir.1998) (citing *Nichols*, 56 F.3d at 410

and 418 18 U.S.C. § 4241(d)). In determining competence, the Court may consider medical opinions as well as its own observation of the defendant's conduct. *See id.* (citing *Nichols*, 56 F.3d at 411). The Court's determination of a defendant's competence will not be disturbed unless it is "clearly erroneous." *See id.*

■ Considering the Court's observation of Berger at the November 27, 2000 Plea Hearing, as well as the psychological reports produced before and after his plea, and Berger's correspondence with counsel attached as exhibits to the instant motion—insofar as these reports and other materials bear on Berger's mental state on the date of the Plea Hearing—the Court finds that there is abundant evidence that Berger was fully competent to enter a guilty plea at the time of the Plea Hearing.

### 1. The Plea Hearing

Berger's behavior at the Plea Hearing indicated that he fully understood the nature of the proceedings against him and was capable of consulting with his lawyer "with a reasonable degree of rational understanding." *Nichols*, 56 F.3d at 411. At the beginning of the hearing, Berger acknowledged that his mind was clear, that he was feeling well, and that he was satisfied with Grand, his counsel at the time. (Plea Tr. at 5–6.) Grand expressly represented to the Court that he had no doubts as to Berger's competence to plead. *Cf . United States v. Vamos*, 797 F.2d 1146, 1150 (2d Cir.1986) (holding that a court may rely on the judgment of defense counsel that a defendant is competent); *Collazo v. United States*, No. 98 Civ. 7059, 1999 WL 335146 (S.D.N.Y.1999) (citing *Vamos*) (same); *Johnson v. Keane*, 974 F.Supp. 225, 231 (S.D.N.Y.1997) (same). Most importantly, Berger gave a detailed, coherent account of the offense conduct that he personally admitted he was "guilty of,"

including causing others "to issue misleading statements to investors." (Plea Tr. at 21.) *See* Part I.D., *supra*.

Although at the Plea Hearing, Berger acknowledged that he knew that his conduct was unlawful at the time he committed his offense (Plea Tr. at 28.), he now asserts that his testimony was false and compelled by his psychological condition. This assertion is unpersuasive. Berger's "[s]olemn declarations in open court carries a strong presumption of verity." *Panuccio v. Kelly*, 927 F.2d 106, 110–11 (2d Cir.1991) (quoting *Blackledge v. Allison*, 431 U.S. 63, 74, 97 S.Ct. 1621, 52 L.Ed.2d 136 (1977)). *See United States v. Juncal* 245 F.3d 166, 171 (2d Cir.2001) ("[Defendant's] testimony [at a plea hearing] carries such a strong presumption of accuracy that a district court does not, absent a substantial reason to find otherwise, abuse its discretion in discrediting later self-serving and contradictory testimony as to whether a plea was knowingly and intelligently made"). Berger's motion and supporting papers neither overcome this presumption nor establish that he was unable to consult his attorney with a "reasonable degree of rational understanding" or to understand the nature of the proceedings against him. *Nichols*, 56 F.3d at 411.

### 2. *Berger's Psychological Evidence*

Berger asserts that, in the period since he entered his guilty plea, "additional psychological evidence has called into question whether he was actually capable of knowingly and voluntarily pleading guilty." (Def.'s Mem. at 17.) Berger argues that the information contained in the reports and affidavits of Drob, Kleinman, and Dorsky, cumulatively cast doubt on his past ability to knowingly and willingly plead guilty. However, a close reading of the foregoing reports and affidavits reinforces, rather than casts doubt on, the Court's

determination that Berger was competent to enter a guilty plea in November 2000.

As discussed in Part I.C., *supra*, Drob, Kleinman and Dorsky all expressed the opinion that Berger suffers from one or more psychological disorders. The first two reports, issued by Drob and Kleinman, primarily address whether Berger had a diminished mental capacity at the time he committed the offense charged in the Information. Accordingly, they do not directly address Berger's competence to plead guilty. However, both reports support the Court's competence determination. Drob's Report indicated that Berger was "cognizant of the nature and wrongfulness of his behavior" and his thinking was "goal directed and coherent." (Drob's Report at 1–2.) Kleinman's Report indicated that during his examination, Berger frequently volunteered information and "coherently presented his thoughts during the period he committed the instant offense." (Kleinman's Report at 43.) When Kleinman asked Berger whether he considered the need of potential investors to accurately appraise their risk before investing in the Hedge Fund, Berger replied, "I'm not saying it was right, I knew it was wrong, I decided the end results, not that I justified it, that the end result justified it." (Kleinman's Report at 47.)

The two affidavits of Dorsky and Drob, both prepared in connection with the instant motion, directly address whether Berger was competent to plead guilty. As discussed in Part I.C., *supra*, Drob's affidavit indicates that "he did *not* believe" that "Berger was incompetent to stand trial or to enter a guilty plea in this case." (Drob's Aff. ¶ 8 (emphasis added).) In contrast, Dorsky's affidavit opined that Berger "was not capable of making a rational decision to plead guilty," and that he did so "as a result of his self-destructive behavior and his compulsive need for ap-

proval by others." (Dorsky's Aff. at 3.) These conclusory statements, contained in a short and concise affidavit attached to the instant motion, are contradicted by the extensive forensic psychological reports of Drob and Kleinman, prepared much closer in time to Berger's Plea Hearing.[4] *See Zovluck v. United States,* 448 F.2d 339, 341–42 (2d Cir.1971) (upholding district court's determination of defendant's competence despite contrary psychiatric testimony).

Furthermore, the timing of Dorsky's statement, approximately ten months after Berger's Plea Hearing and ten days before the instant motion was filed, undermines its weight and credibility. Dorsky's "lone diagnosis" of Berger's incompetence to plead guilty, "which conflicts with opinions of other qualified experts, is too pale a shadow to darken" the Court's judgment of competence. *Nichols,* 56 F.3d at 412 (quoting *Reese v. Wainwright,* 600 F.2d 1085, 1094 (5th Cir.1979)).[5]

**4.** In addition, although Dorsky's affidavit reveals that he has extensive experience treating anxiety disorders and teaching psychiatry (Dorsky Aff. ¶ 1), it does not indicate that he has any experience in forensic psychology, unlike the reports of Drob and Kleinman. As a result, it is likely that Dorsky has less experience evaluating a defendant's mental state in the context of legal standards, such as competence to plead, than Drob and Kleinman.

**5.** The weakness of Berger's argument that he was incompetent to enter a plea on November 27, 2000 was apparent in the conflicting representations made by his counsel, Joseph Bondy, Esq. (hereinafter "Bondy"), at oral argument on January 3, 2002. At one point, Bondy stated, "All we're asking for from your Honor is very simple. It is to give us this withdrawal and set a trial date in the case.... This is not gamesmanship. It's not a change of heart. It's nothing like that whatsoever." (Oral Arg. Tr. at 24.) The Government pointed out that perhaps there was an issue as to Berger's competence to stand trial since he claimed that he was incompetent to enter a plea in November 2000. The Court sought to clarify the issue:

COURT: Mr. Bondy perhaps you can clarify this. Let us suppose for a moment that the court were to allow an overthrow of the guilty plea. Is it your contemplation in the event that, should there be a trial, Mr. Berger would plead insanity or some incompetent defense?

MR. BONDY: No, your Honor. We don't intend to plead insanity or some incompetent defense whatsoever.

Bondy also stated that, if the Court deemed a new arraignment unnecessary, "I would be prepared to select a jury if you withdraw this plea, your Honor, tomorrow." (Oral Arg. Tr. at 50.) In response, the Government asserted that Bondy's position was unclear, but if he was arguing that Berger was incompetent on November 27, 2000 and somehow became competent to stand trial on January 3, 2002, "then we take that as somewhat inconsistent and actually evidences that the defendant was competent in November of 2000." The Court again sought clarification:

COURT: My understanding is that his answer was that if this matter were to go to trial, Mr. Berger would not enter a plea of incompetency or insanity. *That presumes that he is competent to stand trial.* That's what I understood. Mr. Bondy, would you confirm that for [the Government]?

(Oral Arg. Tr. at 52) (emphasis added). Bondy did not respond to the question directly but at the Court's insistence, he replied:

I would clearly, your Honor, if you gave us back the plea, ask for a continuance without a date, continuance *sine die.* And I will tell you precisely why.... All I'm trying to do here is get back a plea. But I have significant questions with respect to Mr. Berger's *ability to meaningfully assist me in the defense.* I am concerned that some of the decisions that the client might want to make would be extremely harmful to him.

(Oral Arg. Tr. at 53) (emphasis added). It is inconceivable that Bondy could be ready to go to trial the next day and also have "significant questions" with respect to Berger's competence to stand trial. Furthermore, it is implausible that a defendant who is not competent to stand trial could have a plan not to plead insanity or incompetence at the trial. Bondy's reversal of his earlier positions regarding Berger's competence and readiness for trial, made only minutes earlier, casts

### 3. Correspondence with Counsel

In addition to the Court's observations of Berger's demeanor and Berger's psychological evidence, Berger's correspondence with counsel, attached as exhibits to the instant motion, indicates that Berger possessed a sophisticated understanding of the charges against him and that he was regularly providing his attorneys with detailed instructions on how to "properly" direct his defense during the period leading up to the Plea Hearing.[6] In fact, Berger's and Grand's statements at the Plea Hearing reflected, in sum and substance, the strategy and content Berger had proposed. (*See* Plea Tr. at 21, 27.) Furthermore, Berger's understanding of the charges against him and his intention to plead guilty are evidenced by his repeated attempts to obtain a cooperation agreement.[7] Finally the Court notes that Berger's affidavit, attached to the instant motion, is concise, clear and well prepared. It reveals not only that Berger understands the nature of the Government's charges against him, but also that he has been actively assisting counsel with his defense. Berger has provided no explanation for the incongruity between his alleged incompetence in November 2000 and the competence revealed by his affidavit and correspondence with counsel contemporaneous with his guilty plea. Based on the foregoing discussion, the Court concludes that Berger has not met his burden of demonstrating that he is entitled to withdraw his plea on the ground that he lacked the requisite competence, and that a preponderance of the evidence in the record of the instant motion reaffirms that

---

some doubt as to the "gamesmanship" in which he denied Berger was engaging.

**6.** *See, e.g.*, Letter from Michael Berger to Paul Grand and Sara Mogulescu, dated November 21, 2000 (hereinafter the "November 21, 2000 Letter") set forth in Affirmation of Counsel, dated September 24, 2001 (hereinafter "Bondy Aff."), Ex. A–8 at 1 ("In order for you to *properly represent my position with respect to the criminal charges brought against me* by the U.S. Attorney's office I would like to outline several issues that I would like to bring to the attention of Judge Marrero on November 27, 2000.... As discussed *I will plead guilty to one count of fraud.* When asked by the judge to describe what happened I will (subject to your input) say something like: Your Honor, I came here today not only to plead guilty but to express my apologies to all shareholders in the fund.") (emphasis added); Fax from Michael Berger to Sara Mogulescu, dated December 15, 2000 ("Following up on our conversation yesterday, I would like to point out that we agreed on the following points, respectively, *please consider the following points as steps that I would like to take:* I would like to serve subpoenas on several people with regards to the complaint that has been brought against me by the SEC.... I will work on the issue of showing that my personal benefit derived from the fraud was minimal and *ask for your assistance after I have completed the initial preparation work.* With respect to Dr. Kleinman, *we will discuss* in detail what will be sent to him. Paul [Grand] may check with Dr. Drob why Kleinman is requesting certain documents and what the relevance of those requests is.") (emphasis added).

**7.** *See, e.g.*, Letter from Michael Berger to Benito Romano, dated February 1, 2000, Bondy Aff. Ex. A–5 at 2 ("I am concerned that me not having access to original[ ] [documents] may limit the level of a cooperation agreement that you will hopefully be able to negotiate on my behalf."); Letter from Michael Berger to Margaret Poster, dated March 31, 2000, Bondy Aff. Ex. A–6, (hereinafter the "March 31, 2000 Letter") at 1 ("In early January, Mr. Romano explained to me that I was ranked at approximately 26 levels under the guidelines and that the cooperation with the government would lead to a reduction in levels. I was happy to hear that and based on his representations cooperated with the government *in order to achieve a milder sentence or judgment* from the government."); November 21, 2000 Letter ("I feel that the USAO and the SEC is conducting investigations on third parties based on my cooperation which would at least theoretically make me eligible for a 5k1 [cooperation agreement].").

Berger was competent to enter his guilty plea on November 27, 2000.

## B. *FACTUAL BASIS TO ENTER PLEA*

Berger contends that his guilty plea lacked an adequate factual basis on two grounds. First, Berger asserts that the Court's inquiry into his mental state and treatment during the November 27, 2000 Plea Hearing was insufficient to ensure that he entered a knowing, voluntary and intelligent plea. In particular, Berger cites the questions and answers at his Plea Hearing related to his ongoing psychotherapy to assert that the Court had an obligation to make a further inquiry into his mental capacity. Second, Berger asserts that he never truly believed that his conduct was wrong or unlawful at the time he committed the alleged offense. Both of these arguments are unavailing.

### 1. *The Court's Inquiry into Berger's Mental State*

At the Plea Hearing, the Court asked Berger whether he was then under the care of a doctor or psychiatrist. Berger responded that since March of 2000 he had been receiving "therapy related to family circumstances". (Plea Tr. at 3–4.) When the Court asked whether his treatment had been successful, Berger replied, "I think my doctor would be able to answer better than I am. I cannot tell whether it was successful or not, in particular because it was not an illness of a physical nature." (*Id.* at 4.) Although Berger's answer may have raised questions as to the nature of his illness, the efficacy of his treatment and whether or not he needed further psychotherapy, it did not bear upon the legal standards relevant to the Court's competency determination: whether or not Berger was able to understand the nature of the proceedings against him or to assist

in the preparation of his defense with a reasonable degree of rational understanding. *See Morrison,* 56 F.3d at 412 ("It is well established that some degree of mental illness cannot be equated with incompetence to stand trial.") (quoting *Vamos,* 797 F.2d at 1150); *Godinez,* 509 U.S. at 399, 113 S.Ct. 2680 (competence standard for a defendant to plead guilty is the same as the standard to stand trial).

Indeed, Berger acknowledged that, at that point, his mind was clear, that he was feeling well, and that he was satisfied with the attorney representing him at the time. Berger's attorney also stated that he had no reason to doubt Berger's competency in entering a guilty plea. Furthermore, the Court observed that Berger was alert, coherent and responsive to the Court's questions at the Plea Hearing. The Court observed nothing in Berger's responses or demeanor to intimate that further inquiry into Berger's competence was necessary. *Cf. United States v. Oliver,* 626 F.2d 254, 258–59 (2d Cir.1980) (upholding district court's decision not to order psychiatric examination and subsequent hearing based solely on the judge's observation and questioning of the defendant, despite evidence of defendant's low intelligence, prior history of heavy drug use, lapses of memory and unresponsiveness).

In addition, Berger asserts that the fact that, in his Plea Agreement with the Government, Berger reserved the right to argue for a downward departure at sentencing based on his alleged "significantly reduced mental capacity," as defined by the Guidelines, also raised significant questions about his competence. However, the question as to whether Berger had a "significantly reduced mental capacity" at the time he committed his offense has little or no bearing on the question as to whether he was competent to enter a guilty plea. The two inquiries focus on

Berger's mental state at different points in time, serve different purposes and require the application of entirely different standards. Furthermore, Berger's reservation in the Plea Agreement simply revealed an argument he intended to make at sentencing—subject to rebuttal arguments from the Government and a distinct determination by the Court—not facts that might suggest that he was incompetent to enter a guilty plea.

 Berger has also failed to show that the Court erred by not conducting a competence hearing. A competence hearing is required "only if the court has 'reasonable cause' to believe that a defendant has a mental defect rendering him incompetent." *Nichols,* 56 F.3d at 414 (citing 18 U.S.C. § 4241(a) and *Pate v. Robinson,* 383 U.S. 375, 385–86, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966)). In deciding that an evidentiary hearing is unnecessary, a court "may rely not only on psychiatrists' reports indicating competence but also on its own observations of the defendant." *Id.* The "determination of whether there is a reasonable cause to believe a defendant may be incompetent rests in the discretion of the district court." *Id.* (citing *Vamos,* 797 F.2d at 1150). In judging whether a court's decision not to order a competence hearing was in error "only the evidence before the court at the time its decision was made is pertinent." *Nicks v. United States,* 955 F.2d 161, 168 (2d Cir.1992).

Moreover, while acknowledging that the circumstances surrounding every defendant must be judged on their own merits and that in this respect every competency determination is unique, no court finding that a particular defendant has the mental capacity to enter an informed, voluntary guilty plea is made in a vacuum. Nor is that judgment entirely removed from experiences gained by the court over the course of recurring similar proceedings. Over time, a trial court learns to identify some generally prevalent signals and guideposts of what conduct of defendants at plea allocutions appears normal or aberrational; what demeanor seems standard or bizarre; what capacity to understand and assist in the proceedings seems rational or either borders or crosses the threshold of the unsound mind; and what manner of response to questions bearing on fundamental aspects of life and liberty manifest alertness and coherence, or evince the torpor of a being unattended by a mind. From within this spectrum of general behaviors and experience—from the accused's appearance and intonations, his movements and quirks, and even from lapses and pauses and proddings—the calibrated eye of the judge can perceive enough to discern overall responses that reveal which defendants are sufficiently knowing and rational, which raise legitimate questions concerning their capacity to rationally understand the proceedings against them and their legal consequences, and which may be staging a self-serving charade.

 As discussed above, the Court, based on its own observations of Berger at the Plea Hearing and prior conferences, found that Berger was competent and that his overall performance was keen and quite genuine. In addition, both the AUSA and Berger's counsel at the time stated that they had no doubts as to Berger's competence to plead.[8] What the rec-

---

**8.** For the reasons set forth in Part II.A.2., *supra,* the Court also finds that the new psychological reports produced after Berger's guilty plea do not provide a reasonable cause to believe that he had a mental defect rendering him incompetent at the time he entered his plea. Accordingly, the Court finds that no sufficiently compelling case has been demonstrated to warrant a hearing on the basis of these reports.

ord shows and the Court witnessed was not a defendant present in body only who exhibited little or no comprehension of the formal proceedings in which he played the most central role, nor even one putting on a forced or poorly disguised feign of competence. Quite to the contrary, Berger was coherent, alert and lucid and overall seemed entirely competent to enter his guilty plea on November 27, 2000. He appeared fully in control of his wits, and well tuned into what was going on and how it legally impacted him. Berger's state of mind at the Plea Hearing is corroborated by his prior correspondence with his attorneys. That material confirms not only that Berger was able to assist counsel in his defense at the Plea Hearing, but that indeed he was actively managing his defense in meticulous detail and with unusual mastery of its intricacies.

Moreover, Berger's responses at the plea allocution exuded not only understanding but a total command of the circumstances that demonstrated far more than average mental agility. In his answers to questions asked by the Court, as well as in impromptu remarks, he drew upon this intellectual capital to hedge and dodge, to parse nimbly the semantic nuances of legal words and to spar with the subtleties of articulated conduct, at times endeavoring to dance delicately around what was incriminating while artfully embracing the self-serving. For example, in preparation for his plea, as recorded in his November 21, 2000 Letter to Grand and Mogulescu, one week before the Plea Hearing, Berger comprehensively outlined his thoughts for how the proceeding should be scripted. He summarized that "[a]s discussed I will plead guilty to one count of fraud." He then drafted the statement he proposed to make to the Court when asked to describe what happened. In very precise and deliberate terms, he lays out his conception of his crime—in a version reflecting almost verbatim what he actually told the Court and what his counsel later read into the record.[9]

Berger's statement was deft enough to elicit a call from the AUSA for clarification as to whether Berger had sufficiently admitted knowledge of his wrongdoing at the time of the crime. As the colloquy already quoted above reveals, Berger appeared evasive as to the precise temporal point he referred to in acknowledging awareness of the illegality of his conduct. (*See* Plea Tr. at 22–23, 28.) But his equivocation seemed prompted not by judgment-clouding incompetence, but rather by a keen sense of the legal consequences of his words, and his interest, for purposes of damage control, in minimizing his wrongs.[10] In fact, at that point in the allocution, Berger engaged in sophistry that would have been atypical of a truly incompetent person, seeking to distinguish between violations of "any principles that applied in the industry" and violations of law. (Plea Tr. at 28.) It required further probing from the Court for Berger to concede his awareness that his acts were also "unlawful" when committed. (*Id.*)

Berger's Plea Hearing responses and his demeanor as a whole demonstrated to this Court that, rather than lacking rational understanding, he possessed notable acuity and control of the situation. His presence of mind could not be more aptly captured than by his own words portraying to his lawyers the merits of the approach he had devised for the explanation he would offer the Court: "This kind of statement would be *slightly* different from 'yes, your Honor

---

9. *See supra,* note 2, and accompanying text.

10. As Berger had written to Wilkie months before: "My only interest lies in no jail time." (March 31, 2000 Letter at 2.)

I lied to investors for three years and defrauded them of 350 million dollars', however it would describe more accurately what I did and thought and what really happened." (November 21, 2000 Letter at 2 (emphasis added).)

That Berger possessed the mental capacity to explain a sophisticated economic theory of his own crafting, and to insist to the day of his plea that he stood by his investment strategy, and that, with more time and access to his computer models of projected valuations of the Hedge Fund's NAV, he could establish the validity of his approach, does not comport with a claim in the same breath that at that time he had no rational understanding of the Government's criminal proceedings against him or meaningful ability to assist counsel in his defense. Insofar as Berger's claim of incompetence now suggests that his consummate performance at the Plea Hearing was really a sham, he apparently exhibited a mastery of verisimilitude that surpassed the Court's appreciation and powers to discern. This Court observed nothing jarring in Berger's answers or appearance, no dissonant chord or atonal echo, signaling to it to be on alert for the thirteenth stroke of the clock.[11] Indeed, if any doubtful extra note in this proceeding sounds discordant, it is that of Berger, long after the fact, invoking as a reason to withdraw his guilty plea that he was not competent to plead on November 27, 2000, and that the plea he then entered was not knowing, intelligent and voluntary.

Berger's claim of incompetence at the Plea Hearing is thus unpersuasive. Were his proposition to be sustained, it would give a new, distorted dimension to the word that would do violence not only to the language, but to the law. Such a theory would allow any defendant with psychological problems, of which there are many, to withdraw his guilty plea upon a change of heart, or a change of counsel. *See Gonzalez*, 970 F.2d at 1100. ("The fact that a defendant has a change of heart prompted by his reevaluation of either the Government's case against him or the penalty that might be imposed is not a sufficient reason to permit withdrawal of a plea.") Admittedly, occasions arise when very fine shades blur the borderline between the competent, the incompetent and the extra-competent, the fraud from the genuine article. But it is the ability to detect that thin line, and properly to locate the immediate case within the bands and patterns of those which have preceded, that forms the essence of a trial court's functions. Here, in this Court's view, Berger's plea falls comfortably within the bounds of competence in the legal sense of the word. Accordingly, the Court found no evidence or reasonable cause at Berger's Plea Hearing to suggest that a competence hearing was required.[12]

■ Nor does the record lend credence to Berger's claim that his guilty plea was not voluntary because he was effectively

---

11. That added gong, according to the old adage, is not only suspect in and of itself, but calls all the preceding ones into question.

12. At oral argument, Bondy indicated that Drob and Dorsky were in the courtroom and were "willing to provide any testimony that may be necessary." (Oral Arg. Tr. at 4.) After the Court clearly indicated that they should be excused, Bondy asked the Court: "Their presence will not be needed at all today, is that correct?" *Id.* The Court's Order, dated December 21, 2001, clearly scheduled an *oral argument* on the motion and made no mention of an evidentiary hearing. Therefore, the presence of the two experts in the courtroom was completely unnecessary if they were present to testify. If the Court had found a hearing to be necessary, both parties would have been given full notice to provide them with sufficient time to prepare and call appropriate witnesses.

coerced into pleading by the pressures of his mental condition. In this regard, Berger maintains that, driven by his compulsive need of approval from others, he felt compelled to enter the guilty plea in order not to disappoint and risk being abandoned by his counsel. This argument fails on at least three grounds.

First, whatever Berger's subsequent explanation of the motivation for his plea, the claim contradicts his unequivocal affirmation to the Court at the Plea Hearing of his understanding that the only ground for entering a guilty plea is that, in fact, "you are guilty, meaning that you did commit the crimes with which the Government has charged you, and for no other reason." (Plea Tr. at 7.) Had Berger harbored any qualms about the true voluntariness and influences actuating his plea, he was afforded numerous occasions during the allocution to voice them directly or through some other recognizable signal. The Court perceived no indication in Berger's expression or demeanor to suggest any such reservations. Indeed, at one point the Court reminded Berger: "Do you understand that you can change your mind right now and refuse to enter a plea of guilty." (Plea Tr. at 9.) Berger replied that he understood and that he nonetheless wished to continue. (*See id.*)

Second, any mental illness from which Berger may have been suffering does not necessarily equate with legal incompetence, that is, a sufficient showing that the condition impaired his ability to understand the Government's proceedings against him factually and rationally and to assist his attorneys in the preparation of his defense. *See Godinez*, 509 U.S. at 398, 113 S.Ct. 2680; *Vamos*, 797 F.2d at 1150.

Third, Berger's argument that his mental condition prevented him from entering a voluntary plea is belied by the evidence. Berger's extensive correspondence with attorneys at both Wilkie and Morvillo portrays not a personality sheepishly beholden to his lawyers, endeavoring to endear himself to them. Rather, the documents evince an assertive, hard taskmaster seeking to steer his defense the way he wanted it to go, at times clashing with his lawyers on legal strategies and in no way deferential or cowed by them, nor shy about conveying how he felt about their advice and performance. For example, in the pre-Plea Hearing November 21, 2000 Letter, Berger instructs his attorneys as follows:

> In order for you to properly represent my position with respect to the criminal charges brought against me by the U.S. Attorney's office I would lie [sic] to outline several issues that I would like to bring to the attention of Judge Marrero on November 27, 2000.

> While it may not be wise to bring up all of these issues now I urge you to bring up at least the facts surrounding the misrepresentation by [Romano] due to his conflict of interest, the Receiver's actions and attitude and the resulting negative consequences with respect to OUSA [sic] and SEC.

(November 21, 2000 Letter at 1.) [13] A client who dismisses or causes more than one

---

13. In the March 31, 2000 Letter addressed to Wilkie's Managing Director, while still being represented by Romano, Berger complained about Romano's performance:

> Although ... Romano called me in order to set up a meeting for the upcoming Monday the issues that should have been addressed weeks and months ago remain unsolved

and my urgent requests have not yielded into any action or even response. The U.S. attorney is waiting for replies in matters and nothing is happening. As a matter of fact I believe that certain aspects of my case have so far been handled in a way that significantly have limited my chances to

attorney to withdraw from representation on account of irreconcilable professional differences or conflicting legal tactics, and openly accuses them of misrepresentation and conflict, can hardly be said to be intimidated by counsel or to be under compulsion to ingratiate himself to them to the point of self-destruction.

### 2. *Berger's Belief That His Conduct Was Not Wrongful*

Berger also contends that he did not believe his conduct was wrongful at the time he committed his offense and therefore he should be permitted to withdraw his guilty plea. Berger acknowledges that, at the Plea Hearing, he stated that he knew his acts were unlawful at the time he committed his offense. However, he insists that he did so only by reason of his mental condition. In Berger's Reply Memorandum of Law in Further Support of his Motion to Withdraw his Plea, dated November 26, 2001 (hereinafter "Def.'s Reply Mem."), he states that it is "simply improper to accept a guilty plea from a defendant who does not believe that at the time of an offense, he was acting illegally yet pleads guilty so as to appease or please others." (Def.'s Reply Mem. at 14.)

 Having found that Berger was competent to enter his plea, this Court finds no reason to doubt Berger's declaration under oath that he knew that his conduct was unlawful at the time he committed his offense.[14] Even if Berger had

not repeated his statement that he knew his conduct was unlawful, there was still a sufficient factual basis for the Court to accept Berger's guilty plea. At the Plea Hearing, Berger admitted that he "was unable and not capable" of admitting the amount of the Hedge Fund's losses, and as a result, he "caused others to issue misleading statements to investors." (Plea Tr. at 21.) When the Court asked Berger whether he knew that his acts were wrong and illegal when he committed them, he stated, "I realize now that it was, and I closed my eyes in doing what I did. I firmly believed my strategy would work out, and I felt that the end would justify the means." (*Id.* at 22.)

Such statements provided a sufficient factual basis for Berger's guilty plea. Were a jury to find that Berger intentionally caused others to issue materially false or misleading statements of the Hedge Fund's value to its investors, combined with his conscious avoidance, or "closing [his] eyes," as he phrased it, to knowledge that his conduct was illegal, he properly would be found guilty, even if he "firmly believed" that, in the end, his strategy would "work out." *See Juncal,* 245 F.3d at 170 (holding that district court had a sufficient factual basis for a guilty plea because evidence of defendant's "conscious avoidance" of knowledge that his acts were illegal "would suffice to provide the knowledge element" under mail fraud statute if

work out a Cooperation Agreement with the U.S. Attorney's office. . . .
(March 31, 2000 Letter at 1.) The previous day, Berger had sent an e-mail message directly to Romano stating that "[t]he comments and opinions you expressed today are nothing less than outrageous. . . . Be aware that I brought up the receiver issue with you already in late January and you chose to do nothing about it. I guess your personal relationship with [the Receiver] is more important than your client's rights." (E–Mail Mes-

sage from Berger to Romano, dated March 30, 2000, Bondy Aff. Ex. A–7, at 1.)

**14.** The Court also notes that Berger told Kleinman that he knew that his conduct was wrong and he "decided the end results . . . justified it." (Kleinman's, Report at 47.) He further admitted to Drob that "the fact that I had the two largest accounting firms continue—or fooled. I thought there was a chance it would continue." (quoted in Kleinman's Report at 44.)

the case had gone to trial); *United States v. Walker*, 191 F.3d 326, 337 (2d Cir.1999) (holding that jury may be given conscious avoidance instruction if evidence may be construed as "deliberate ignorance" of requisite knowledge).

Although it is clear that the Government would have to prove that Berger "willfully" violated Rule 10b–5 to obtain a conviction, *see United States v. O'Hagan*, 521 U.S. 642, 665–66, 117 S.Ct. 2199, 138 L.Ed.2d 724 (1997) (hereinafter *O'Hagan I* ), " 'willfully' simply requires the intentional doing of the wrongful acts—no knowledge of the rule or regulation is required." *United States v. O'Hagan*, 139 F.3d 641, 647 (8th Cir.1998) (on remand) (hereinafter *O'Hagan II* ) (citing *United States v. Dixon*, 536 F.2d 1388, 1395 (2d Cir.1976) and *United States v. Charnay*, 537 F.2d 341, 351–52 (9th Cir.1976)). *See generally*, Note, *Culpable Intent Required for All Criminal Insider Trading Convictions After United States v. O'Hagan*, 40 B.C.L.Rev. 1187 (1999).[15]

## C. *INEFFECTIVE ASSISTANCE OF COUNSEL*

In addition to Berger's argument that he was incompetent to enter a guilty plea, he also contends that ineffective assistance of counsel prevented him from entering a knowing and voluntary plea. He bases this argument on three grounds: first, he maintains that his counsel failed to demand the production of exculpatory evidence on the issue of his guilt; second, he asserts that his counsel failed to zealously pursue his desire to enter into a cooperation agreement with the Government; and third, Berger asserts that his counsel was operating under a material conflict of interest when he entered his plea. (Def.'s Mem. at 21–22.)

Under *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), for a defendant to establish a claim that his counsel provided ineffective assistance, he must prove two elements: first, that "counsel's performance was deficient," that is, that the attorney made errors "so serious" that the representation fell below an "objective standard of reasonableness" under "prevailing professional norms"; and second, that but for the deficiency, there is a "reasonable probability" that "the result of the proceeding would have been different." *Id.* at 687–88, 694, 104 S.Ct. 2052. A "reasonable probability" in this context is a "probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. 2052. The standard under *Strickland*, is "applicable to ineffective-assistance claims arising out of the plea process." *Hill v. Lockhart*, 474 U.S. 52, 57, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985).

In applying the *Strickland* test, "judicial scrutiny of counsel's performance must be highly deferential" and "a court must indulge a strong presumption that counsel's conduct falls within the wide

---

**15.** Under 15 U.S.C. § 78ff(a), "no person shall be subject to imprisonment under this section for the violation of any rule or regulation if he proves that he had no knowledge of such rule or regulation." This provision creates an affirmative defense to imprisonment rather than to conviction. *See O'Hagan II*, 139 F.3d at 646. In the instant case, however, Berger did not argue that he had such a defense, and thus, this provision is of no consequence. As discussed above, Berger voluntarily pled guilty to "unlawfully, willfully, and knowingly" violating § 10(b) and Rule 10b–5. (Plea Tr. at 10–11.) Furthermore, there is no evidence in the record to suggest that Berger, as a professional in the securities industry, was unaware of § 10(b) or Rule 10b–5. In fact, when the Court asked Berger if he knew that his acts were wrong and illegal when he committed them, Berger replied, "I knew they were against any principles that applied in the industry, yes." (Plea Tr. at 28.)

range of reasonable professional assistance." *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052. The inquiry focuses "on the fundamental fairness of the proceeding whose results are being challenged." *Id.* at 696, 104 S.Ct. 2052. "The court's central concern is not with 'grading counsel's performance' but with discerning 'whether despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results.'" *United States v. Aguirre*, 912 F.2d 555, 560 (2d Cir.1990) (quoting *Strickland*, 466 U.S. at 696–97, 104 S.Ct. 2052).

### 1. *Failure to Demand Exculpatory Information*

■ Berger asserts that Morvillo, through Grand and Mogulescu, provided ineffective assistance by failing to request that (1) the Government produce exculpatory evidence, as it is required to do under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); and (2) the Receiver produce exculpatory evidence.[16]

■ In particular, Berger contends that computer files kept at MCM, including his computer model for investing, would have demonstrated his "good faith belief" in his "contrarian strategy" for short-selling stocks. (Def.'s Mem. at 24.) As discussed below, the Court is not persuaded that objectively his counsel's performance fell below the standard of rea-

sonable professional assistance on the grounds Berger asserts. Moreover, even if counsel's representation of Berger were to be found wanting in some respect, as alleged, Berger has failed to establish that he was prejudiced by Morvillo's failure to obtain the evidence he sought. As the Supreme Court noted in *Hill:*

> Where the alleged error of counsel is a failure to investigate or discover potentially exculpatory evidence, the determination whether the error "prejudiced" the defendant by causing him to plead guilty rather than go to trial will depend on the likelihood that discovery of the evidence would have led counsel to change his recommendation as to the plea. This assessment, in turn, will depend in large part on a prediction whether the evidence likely would have changed the outcome of a trial.

*Hill*, 474 U.S. 52, 106 S.Ct. at 370. *See also U.S. v. Carraballo*, No. 98 Cr. 1316, 2001 WL 111284,*5–*6 (S.D.N.Y. Feb. 8, 2001) (finding no ineffective assistance because defendant failed to show that thorough investigation would have changed counsel's recommendation to plead guilty).

It is very unlikely that discovery of Berger's computer files and investment model would have caused Grand or Mogulescu to change their recommendation that he plead guilty to Count One of the Information. As discussed in Part II.B.2., *supra,* Berger's alleged "good-faith belief" that his investment strategy would ultimately

---

**16.** Berger's argument that Grand and Mogulescu provided him ineffective assistance of counsel because they failed to advise him on "the existence of a good-faith or lack of intent defense" (Berger Aff. ¶ 42) is meritless. Reviewing the evidence in the record, even if Grand and Mogulescu did not advise Berger of such a defense, such a decision would not have been an error "so serious" that the representation fell below an "objective standard of reasonableness" under "prevailing profes-

sional norms." *Strickland*, 466 U.S. at 687–88, 104 S.Ct. 2052. It is doubtful whether Berger could even plausibly use such a defense. As discussed in Part II.B., *supra,* Berger's statements at the Plea Hearing and evidence attached to the instant motion reveal that Berger either or both (1) knew that his conduct was wrongful and illegal at the time he committed his offense and (2) deliberately ignored that it was wrongful or illegal.

be successful is not a plausible defense to intentionally misstating or failing to disclose material facts to investors, in violation of § 10(b) and Rule 10b–5. As a result, Berger has failed to show how the discovery of his computer files or investment model would have changed the outcome of the instant case had it gone to trial. Accordingly, the Court finds that Grand and Mogulescu did not provide ineffective assistance by failing to request the production of materials that Berger requested.[17]

■■ Berger also claims he sought from the Government "witness statements, debriefings, proffer notes, and evidence of emoluments or deals extended to government witnesses." (Def.'s Mem. at 26.) Berger has failed to establish the relevance of such materials: he has neither explained how they might have changed his counsel's recommendation to plead guilty, nor how they might have changed

the outcome of the case had it gone to trial. Accordingly, as with the computer files, the failure to request such materials does not establish ineffective assistance of counsel.

## 2. *Failure to Obtain a Cooperation Agreement with the Government*

■■ Berger also contends that his counsel provided him with ineffective assistance by failing to "zealously pursue" his desire to obtain a cooperation agreement from the Government. This argument is also meritless. As the Government points out in its papers, it had no interest in entering into a cooperation agreement with Berger. (*See* Govt.'s Mem. at 6, 56.) Berger can identify no specific errors by counsel which led to the Government's lack of interest in an agreement.[18] Furthermore, a cooperation agreement would have possibly affected the length of Berger's sentence,[19] but it would not have changed his

---

**17.** Regarding Berger's argument that his counsel provided ineffective assistance by failing to request exculpatory evidence from the Receiver, the Court notes that a court-appointed receiver in a civil case has no obligation under *Brady* to produce evidence that is potentially exculpatory in a parallel criminal case. In the instant motion, Berger has not made any assertion that the Government somehow obtained copies of the Receiver's files which he was seeking. Assuming *arguendo*, that the Government did have copies of the files in question, Berger would still be unable to establish that his counsel's failure to demand such files constituted ineffective assistance. As discussed above, evidence showing that Berger believed that his investment scheme would work out in the end is not a plausible defense to securities fraud and his counsel's failure to request such materials does not raise any doubts about the effectiveness of his counsel's assistance. To the extent that Berger now claims that this allegedly exculpatory evidence would show that he did not cause others to issue misleading statements to investors of the Hedge Fund, the Court finds that such conclusory, self-serving assertions, which are contradicted by the

sworn testimony that he gave at his Plea Hearing, fail to provide a fair and just reason to allow Berger to withdraw his guilty plea. In the instant motion, Berger has not identified any specific evidence that would have potentially caused his counsel to recommend that he not plead guilty.

**18.** The Court also notes that Berger's intense desire to obtain a cooperation agreement, as evidenced by his correspondence with counsel, cited in note 7, *supra*, reinforces the Court's finding that Berger pled guilty because he was in fact guilty. For example, in his March 31, 2000 Letter, Berger admitted that he had "cooperated with the government in order to achieve a milder sentence or judgment." It is unlikely that one who does not believe in his guilt would cooperate with the Government to obtain a milder sentence.

**19.** Even for purposes of sentencing, it is very unlikely that Berger would be able to establish that his counsel provided ineffective assistance in obtaining a cooperation agreement. As a prerequisite, Berger would have to establish that (1) he had *specific* information, unknown to the Government at the time of their

counsel's recommendation to plead guilty. Accordingly, the Court finds that Berger's counsel did not ineffectively assist him by reasons of Berger's unsuccessful efforts to obtain a cooperation agreement with the Government.

3. *Alleged Conflicts of Interest*

 Berger asserts that he was unable to enter a knowing and voluntary plea because both law firms which represented him before he entered his plea were operating under material conflicts of interest. The standard that governs an ineffective assistance claim based on an asserted conflict of interest was articulated by the Supreme Court in *Cuyler v. Sullivan,* 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980), and is somewhat different from the standard enunciated in *Strickland. See United States v. White,* 174 F.3d 290, 294–95 (2d Cir.1999). In this context, a defendant is entitled to a presumption of prejudice if he can demonstrate (1) that his attorney labored under an "actual conflict of interest," and (2) that the "actual conflict of interest adversely affected his lawyer's performance." *Id.* (quoting *Cuyler,* 446 U.S. at 348–49, 100 S.Ct. 1708); *see also United States v. Stantini,* 85 F.3d 9, 15–16 (2d Cir.1996). However, the burden of proof "cannot be met by speculative assertions of bias or prejudice." *Triana v. United States,* 205 F.3d 36, 40 (2d Cir. 2000).

 While conflict of interest claims arise most frequently in the context of multiple or joint representation, it is well settled that the *Cuyler* analysis applies in situations where the asserted conflict is between the interests of the defendant and those of his attorney. *See White,* 174 F.3d at 295 (citing *United States v. Fulton,* 5 F.3d 605, 609 (2d Cir.1993)); *Winkler v. Keane,* 7 F.3d 304, 307 (2d Cir.1993). In response to such a claim, a Court must engage in a three-stage analysis, assuming that the defendant meets his burden at each stage. *See United States v. Moree,* 220 F.3d 65, 69 (2d Cir.2000). First, the defendant must establish that an "actual conflict of interest" existed. *Id.* (citing *Winkler,* 7 F.3d at 307). An actual conflict of interest arises during representation when "the attorney's and defendant's interests diverge with respect to a material factual or legal issue or to a course of action." *Id.* Next, the defendant must establish that an "actual lapse in representation" resulted from the conflict. *Id.* (citing *Cuyler,* 446 U.S. at 349, 100 S.Ct. 1708). An "actual lapse in representation" is demonstrated by the existence of some "plausible alternative defense strategy" not taken up by counsel. *Winkler,* 7 F.3d at 309 (quoting *United States v. Gambino,* 864 F.2d 1064, 1070 (3d Cir. 1988)). Third, the defendant must show causation—that the alternative defense was "inherently in conflict with or not undertaken due to the attorney's other loyalties or interests." *Id.* (quoting *Gambino,* 864 F.2d at 1070) (emphasis added).

 Because under *Cuyler* the defendant benefits from a presumption of the prejudice that he would otherwise have to affirmatively prove under *Strickland,* courts have noted the incentive for defendants to characterize ordinary ineffective

---

plea negotiations, sufficient to interest the Government in a cooperation agreement, (2) he would have agreed to all the terms demanded by the Government, (3) any cooperation would have amounted to substantial assistance under the Guidelines, and (4) he would have complied fully with any coopera-

tion agreement. In addition, he would have to show that but for some unprofessional error by his counsel, he would have been able to obtain such an agreement. *See Rojas v. United States,* Nos. 00 Civ. 6501 and 98 Cr. 370, 2001 WL 50952, *1 (S.D.N.Y. Jan. 22, 2001).

assistance of counsel claims as conflict of interest claims. *See, e.g., White,* 174 F.3d at 296 (noting that defendant characterized a routine disagreement with his counsel over defense strategy as a conflict of interest to obtain the benefit of *Cuyler's* presumption of prejudice and avoid *Strickland's* requirement that prejudice be affirmatively proven). The mere expression of a defendant's dissatisfaction with his counsel's performance or trial strategy is insufficient to establish that an actual conflict of interest exists. *Id.*

▬ In the instant case, the Court need go no further than the first stage of the foregoing analysis. Berger has not established that his counsel at the time he entered his guilty plea was operating under an actual conflict of interest.[20] Berger claims that Grand and Mogulescu "showed great reluctance to ask for documents" from the Receiver. (Berger Aff. ¶ 44.) Berger further alleges that Grand informed him that the Receiver's law firm was a "friendly competitor" and that Grand did not want to upset them by pushing to obtain the allegedly exculpatory documents that Berger had requested. (Berger Aff. ¶ 45.) Finally, Berger alleges that he looked through a file box related to his case in Grand's offices in October 2000, and it is his "recollection that several names of co-defendants in parallel civil proceedings and targets of the SEC and USAO's investigation into the Manhattan Investment Fund appeared on this list." (Berger Aff. ¶ 46.)

As an initial matter, the Court notes that Berger's discovery of Grand's alleged conflict of interest occurred several months before he pled guilty. In spite of this, in the instant motion, he does not explain why he failed to inform the Court of the alleged conflict at his Plea Hearing or why he testified that he was satisfied with his counsel at the time. Putting these facts aside, Berger's allegations are nothing more than "speculative assertions of bias or prejudice," and do not establish that an actual conflict of interest existed. *Triana,* 205 F.3d at 40. *See Cuyler,* 446 U.S. at 350, 100 S.Ct. 1708 ("[U]ntil a defendant shows that his counsel actively represented conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance.") Rather, it appears that Berger has characterized a routine disagreement over his counsel's decision to not seek the discovery of certain materials as a conflict of interest. *See White,* 174 F.3d at 296 (holding that defendant who expressed disagreement with his attorney on the decision to file certain motions and pursue evidentiary leads had not established the existence of an actual conflict of interest).

No more persuasive is Berger's assertion that Grand was conflicted by virtue of his "friendly competitor" relationship with the Receiver's firm, which Grand allegedly did not wish to upset. There is no evidence, beyond Berger's conclusory and self-serving arguments, that in fact, the material Berger sought to obtain from the

---

**20.** Wilkie's representation of Berger has little or no bearing on Berger's claim that ineffective assistance of counsel prevented him from entering a knowing and voluntary plea. Wilkie, through its attorney, Romano, withdrew as Berger's counsel on March 30, 2000, approximately eight months before Berger's Plea Hearing. (Berger Aff. ¶ 7.) Shortly thereafter, Berger retained Morvillo, with Grand and Mogulescu acting as primary

counsel. (Berger Aff. ¶ 32.) Although Berger claims that Romano had a "profound impact on the plea negotiations" (Berger Aff. ¶ 3), he has failed to establish that Romano's allegedly conflicted representation of him somehow caused him to enter a guilty plea eight months after Romano's services ended and while Berger was represented by different counsel.

Receiver would have been exculpatory. By his own admission, the documents Berger sought related to various computer models of valuations of the Hedge Fund. Berger sought the material to establish his theory, already discredited above, of his belief in the market soundness of his investment strategy and to vindicate his conviction that given more time his approach would have been validated. Berger overlooks the obvious flaw in this reasoning. No matter how intensely he may have believed in the soundness of his investment theory, and however devoutly he may have wished for time to prove him a prophet rather than a fraud, his self-confidence does not justify the means, wrong and unlawful by his own admission,[21] that he employed to gain time to demonstrate that he was right: deliberately causing reports containing information that had been materially altered and falsified at his direction to be sent to clients to induce their continued investment.

Accordingly, the Court concludes that Berger's claim of ineffective assistance is governed by the standard set out in *Strickland*. As discussed above in Part II.C.1., Berger has failed to establish that his disagreements with counsel about which documents to seek for his defense constitute ineffective assistance of counsel.

### D. *FINE RANGE STATED IN THE PLEA AGREEMENT*

Berger asserts that the Government misstated the potentially applicable fine range in the Plea Agreement and, as a result, that he should be permitted to withdraw his guilty plea.[22] The Plea Agreement correctly states that Count One of the Information carries a "maximum fine of the greatest of (1) $1,000,000; (ii) twice the gross pecuniary gain from the offense; or (iii) twice the gross pecuniary loss to a person other than the defendant." (Plea Agreement at 1.) The Plea Agreement also states that "after determining the defendant's ability to pay, the Court *may impose* a fine pursuant to § 5E1.2 [of the Guidelines]. At Guidelines level 27, the applicable fine range is $12,500 to $125,000." (*Id.* at 3) (emphasis added). The language "may impose" reveals that the imposition of a fine is within the discretion of the Court and the Government could not guarantee what any applicable fine would be.

 The Plea Agreement was mistaken in one respect. Under § 5E.1.2(c)(2) of the Guidelines, the maximum fine for an offense level of 27 is usually $125,000. However, the Guidelines clearly state that § 5E.1.2(c)(2) "does not apply if the defendant is convicted under a statute authorizing a maximum fine greater than $250,000...." Guidelines § 5E.1.2(c)(4). Because the statute which Berger violated authorizes a maximum fine of the greatest of $1,000,000, twice the gain from the offense, or twice the loss to another person, there is no applicable fine range under the Guidelines, aside from the statutory maximum. *Id.* However, this error is immaterial. The Plea Agreement also clearly states:

It is understood that the sentence to be imposed upon is *determined solely by the Court.* [The AUSA's] office cannot, and does not, make any promise or representation as to what sentence the de-

---

**21.** (*See* Plea Tr. at 22.) ("I firmly believed that my strategy would work out, and I felt that the end would justify the means. And I now realize that that was severely wrong.")

**22.** This argument is essentially one which should be presented at sentencing, but the Court will address it to the extent that Berger claims that he would not have pled guilty but for his misunderstanding of the applicable fine range.

fendant will receive. Moreover, it is understood that the *defendant will have no right to withdraw his plea of guilty* should the sentence imposed by the Court be outside the Guidelines range set forth above.

(*Id.* at 4 (emphasis added).) In addition, at the Plea Hearing, the Court set forth the accurate maximum penalties Berger faced, including the appropriate fine range. (Plea Tr. at 11.) The Court did not mention or make any reference to the analysis under the Sentencing Guidelines that it may engage in for purposes of Berger's sentencing. Just the opposite, Berger acknowledged that he understood that he would be bound to his guilty plea and would have no right to withdraw his guilty plea, even if the sentence imposed by the Court is outside the Guidelines range set forth in the Plea Agreement or if it "is different from what . . . anyone has told you it might be, or if it is different from what you expect. . . ." (*Id.* at 14.)

Accordingly, the Court finds that the Plea Agreement's erroneous estimate of the applicable fine range is not a valid basis for Berger to withdraw his guilty plea. *See United States v. Sweeney*, 878 F.2d 68, 69–71 (2d Cir.1989) (holding that defendant was not entitled to withdraw his plea before sentencing even though his attorney had mistakenly estimated the applicable sentencing range); *see also United States v. Horne*, 987 F.2d 833, 837–38 (D.C.Cir.1993) (where applicable sentencing range exceeded that anticipated by the plea agreement, district court did not abuse discretion in denying motion to withdraw plea) (cited in *United States v. Taylor*, No. 99–1382, 2000 WL 1786338,*2 (2d Cir. Dec. 5, 2000) (unpublished opinion)).

### E. SUBJECT MATTER JURISDICTION

■ Berger's final argument, raised for the first time in his reply papers, is that the Court lacks subject matter jurisdiction over the case because the investors in the Hedge Fund were almost entirely foreign. (Def.'s Reply Mem. at 26.)[23] Although Berger is correct that subject matter jurisdiction is "an unwaivable sine qua non for the exercise federal judicial power," *Herrick Co. v. Scs Communs., Inc.*, 251 F.3d 315, 322 (2d Cir.2001), his assertion that the Court lacks such jurisdiction is unavailing.

■ In order to sustain a challenge to the Court's subject matter jurisdiction, a defendant who has pled guilty must establish that the face of the indictment or information reveals that the count or counts to which he pled guilty failed to charge a federal offense. *See Hayle v. United States*, 815 F.2d 879, 881–82 (2d Cir.1987) (citing *LaMagna v. United States*, 646 F.2d 775, 778 (2d Cir.1981)); *United States v. Santelises*, 476 F.2d 787, 788 (2d Cir.1973) (*coram nobis* attack on guilty plea based on alleged failure of indictment to allege violations of federal law must be rejected "unless [the indictment] is so defective that it does not, by any

**23.** Berger's cursory assertion, also raised for the first time in his reply papers, that the Government "would be hard pressed to establish that any investors relied upon the allegedly inaccurate NAV calculations in deciding to invest in the fund" (Berger Reply Mem. at 24), is equally meritless. The law is well-settled that "the Government need only prove that the false representation is one that a reasonable [investor] would rely on in pur-

chasing or selling the relevant [ ] shares." *United States v. Gleason*, 616 F.2d 2, 28 (2d Cir.1979) (citing *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 860 (2d Cir.1968) (en banc)). Furthermore, as discussed above, Berger's reevaluation of the Government's evidence is an improper basis to permit the withdrawal of his guilty plea. *See Gonzalez*, 970 F.2d at 1100.

reasonable construction, charge an offense for which the defendant is convicted") (quoting *United States v. Trollinger*, 415 F.2d 527, 528 (5th Cir.1969)); *United States v. Smith*, 407 F.2d 33, 34 (2d Cir. 1969). The requirement that the alleged jurisdictional defect be apparent from the face of the indictment "reflects the line between issues that go to the court's power to entertain the prosecution and those that go merely to the government's ability to prove its case." *Hayle*, 815 F.2d at 882.

 In the instant case, a comparison of Count One of the Information and Rule 10b–5 reveals that the Information clearly alleges all the elements of a federal offense. The Information adopts, almost word for word,[24] the language of Rule 10b–5[25] to allege that Berger committed a securities violation. As a result, Berger's challenge merely goes to the merits of the Government's prosecution, not to the jurisdiction of the Court. *See Hayle*, 815 F.2d at 882 ("If the indictment [or Information] alleges all of the statutory elements of a federal offense and the defendant's contention is that in fact certain of those elements are lacking, the challenge goes to the merits of the prosecution, not to the jurisdiction of the court to entertain the case or to punish the defendant if all of the alleged elements are proven.") (citing *LaMagna*, 646 F.2d at 778).[26]

24. Paragraph twenty of the Information alleges that:

From in or about September 1996 through in or about January 2000, in the Southern District of New York and elsewhere, Michael Berger, the defendant unlawfully, willfully, and knowingly, by the use of the means and instrumentalities of interstate commerce and of the mails, directly and indirectly, did use and employ in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances in violation of Title 17, Code of Federal Regulations, Section 250.10b–5, by: (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business that operated and would operate as a fraud and deceit on persons, to wit, Berger made false representations and material omissions regarding the Hedge Fund's performance and financial status to the Hedge Fund's investors, the Administrator, and Deloitte [the Auditor].

(Information ¶ 20) (citing 15 U.S.C. §§ 78j(b) and 78ff; 17 C.F.R. § 240.10b–5; 18 U.S.C. § 2).

25. Rule 10b–5 states:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) to employ any device, scheme, or artifice to defraud, (b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

26. The Court also notes that in the civil enforcement proceedings against Berger, where he asserted a similar jurisdictional challenge, Judge Cote recently found that:

The undisputed evidence is sufficient to establish subject matter jurisdiction. Although the Fund operated as a qualified offshore investment fund, and substantial activities for the Fund—including marketing efforts, administration and auditing—were conducted outside the United States, the fraud was run from the United States and decisions made in the United States were directly responsible for investor losses.

Specifically, the fraud was conceived and executed in New York by Berger, who implemented the scheme through his wholly-owned company, MCM, a Delaware corporation with its principal place of business in New York. The Offer Memo advertises the

## III. CONCLUSION AND ORDER

For the reasons set forth above, it is hereby

**ORDERED** that Berger's Motion to Withdraw his Guilty Plea is DENIED; and it is further

**ORDERED** that Berger appear before the Court for sentencing on March 1, 2002 at 3 p.m.; and it is further

**ORDERED** that Berger file requests related to sentencing, if any, by February 11, 2002; and it is further

**ORDERED** that the Government file a response, if any, by February 15, 2002. **SO ORDERED.**

## DECISION AND ORDER

In a Decision and Order dated January 28, 2002, the Court denied a motion by Defendant Michael Berger (hereinafter "Berger") to withdraw his plea of guilty to Count One of Information No. 00 Cr. 877. By letter dated February 7, 2002, Berger requested that the Court reconsider portions of its January 28, 2002 Decision and Order related to Berger's claims of ineffective assistance of counsel. In his letter,

Berger asserted that counsel who represented him at the time he entered his guilty plea, Paul Grand, Esq. (hereinafter "Grand"), provided ineffective assistance due to an actual conflict of interest. This purported conflict of interest arose from, among other things, Grand's simultaneous representation of Berger and Bear Stearns, against whom Berger had hoped to offer allegedly incriminating information in exchange for a cooperation agreement with the Government.[1] On February 11, 2002, the Government filed a response asserting that Berger's request fails to meet the applicable standard for reconsideration of the Court's January 28, 2002 Decision and Order.

Reconsideration of a previous order is an "extraordinary remedy to be employed sparingly in the interests of finality and conservation of scarce judicial resources." *In re Health Management Systems Inc., Securities Litig.*, 113 F.Supp.2d 613, 614 (S.D.N.Y.2000). Under Local Rule 6.3, which governs motions for reconsideration, the moving party must demonstrate controlling law or factual matters which it believes the court overlooked and that

---

Fund to "U.S. entities subject to the Employee Retirement Income Security Act of 1974, as amended ('ERISA') or other entities exempt from U.S. tax," among others. Berger's investment strategy principally involved the concentrated short selling on American exchanges of securities of United States technology companies. The Fund's securities transactions were cleared in New York by Bear Stearns and the Fund's assets were in Bear Stearns' custody in New York. Berger prepared the fictitious financial statements in New York. These statements were then sent offshore to the Fund's administrators, and then calculations based on these statements were re-transmitted back into this country and abroad to prospective investors, current shareholders, and their agents.
*SEC v. Berger*, 2001 WL 1403028 at 4 (citing *Alfadda v. Fenn*, 935 F.2d 475, 478–79 (2d Cir.1991)). In spite of Judge Cote's well-reasoned determination that subject matter

jurisdiction existed in parallel civil proceedings, in the instant case, the Court must engage in an independent analysis since "principles of estoppel do not apply to questions of subject matter jurisdiction." *Creaciones Con Idea, S.A. de C.V. v. Mashreqbank PSC*, 232 F.3d 79, 82 (2d Cir.2000) (quoting *Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702, 102 S.Ct. 2099, 72 L.Ed.2d 492 (1982)).

1. The other arguments contained in Berger's February 7, 2002 Letter, such as his belief that counsel failed to effectively assist him with the development of a "good-faith defense," are meritless and were thoroughly considered and clearly rejected in the Court's January 28, 2002 Decision and Order. The Court finds in these contentions, no facts or pertinent law presented that the Court overlooked or failed to apply.

might reasonably be expected to alter the court's decision. *See SEC v. Ashbury Capital Partners, L.P.*, 00 Civ. 7898, 2001 WL 604044, *1 (S.D.N.Y. May 31, 2001) (citing *AT & T Corp. v. Comty. Network Servs., Inc.*, No. 00 Civ. 316, 2000 WL 1174992, at *1 (S.D.N.Y. Aug.18, 2000) and Local Rule 6.3). Local Rule 6.3 is intended to "ensure the finality of decisions and to prevent the practice of a losing party [from] examining a decision and then plugging the gaps of a lost motion with additional matters." *See id.* (citing *Carolco Pictures, Inc. v. Sirota*, 700 F.Supp. 169, 170 (S.D.N.Y.1988)). A Court must narrowly construe and strictly apply Local Rule 6.3, so as to avoid duplicative rulings on previously considered issues, and to prevent the rule from being used as a substitute for appealing a final judgment. *See Shamis v. Ambassador Factors Corp.*, 187 F.R.D. 148, 150 (S.D.N.Y.1999).

Having reviewed Berger's February 7, 2002 Letter and the Government's response, the Court concludes that Berger has failed to demonstrate that, in ruling upon his original motion, the Court overlooked any facts presented or applicable case law.

In Berger's motion to withdraw his guilty plea, he first asserted that Grand's alleged refusal to demand exculpatory information from the Receiver "was the direct result of [Grand's] desire not to upset or alienate [the Receiver]." (*See* Defendant Michael Berger's Motion to Withdraw His Guilty Plea, dated September 24, 2001, at 23.) Although Berger's alleged "recollection" was that he saw a box in Grand's offices with a printed conflict check that showed that Grand's firm, Morvillo, Abramowitz, Grand, Iason & Silberberg, P.C.

(hereinafter "Morvillo"), represented several co-defendants in parallel civil proceedings (Affidavit of Michael Berger, dated September 24, 2001, ¶ 46), and although Berger later asserted that Morvillo was representing "other cooperative interests" (Berger's Reply Memorandum of Law in Further Support of his Motion to Withdraw Plea, dated November 26, 2001, at 19), at no point did he specifically allege that Morvillo was representing Bear Stearns. As a result, Berger's request for reconsideration is an impermissible attempt to allege new facts and theories. *See Ashbury Capital Partners*, 2001 WL 604044 at *1 ("A party may not present new facts or theories [on reconsideration].") (citing *Ralph Oldsmobile Inc. v. General Motors Corp.*, No. 99 Civ. 4567, 2001 WL 55729, at *2 (S.D.N.Y. Jan.23, 2001)).[2]

Having fully considered the allegations and contentions asserted in Berger's motion, the Court concludes that Berger presents nothing sufficient to warrant reconsideration of the Court's January 28, 2002 Decision and Order.

### ORDER

For the reasons set forth above, it is hereby

**ORDERED** that Berger's request for reconsideration is DENIED; and it is further

**ORDERED** that Berger's sentencing will proceed, as previously scheduled, on March 1, 2002 at 3 p.m.

**SO ORDERED.**

---

**2.** Even if Berger had presented such allegations, which he did not, the Court would still find that Berger is not entitled to withdraw his guilty plea. As the Government points out in its February 11, 2002 Letter, while Morvil-

lo may have represented an executive from Bear Stearns, Berger has presented no evidence that Morvillo represented Bear Stearns as an institution.